NAOMI JOHNSTON, Plaintiff-Appellee, v. ANCHOR ORGANIZATION FOR HEALTH MAINTENANCE, Defendant-Appellant.

First District (4th Division)   Nos. 1—90—3413, 1—91—0340 cons.

Opinion filed July 29, 1993.

William D. Frazier, of Chicago, for appellant.

Allen W. McDowell and Thomas J. Fitzgibbons, both of McDowell, Moll, Fitzgibbons & Drew, Ltd., and James E. Nuellen, both of Chicago, for appellee.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Anchor Organization for Health Maintenance (hereinafter Anchor), appeals the judgment of the circuit court of Cook County which awarded plaintiff, Naomi Johnston, $6,787.40 in actual damages, $50,000 in punitive damages, $22,714.96 in attorney fees and $2,511.28 in costs arising out of claims brought under the Consumer Fraud and Deceptive Business Practices Act. Ill. Rev. Stat. 1991, ch. 121½, par. 261 *et seq.*

On appeal, defendant contends (1) plaintiff failed to prove public injury as required by the Consumer Fraud and Deceptive Business Practices Act when the action accrued; (2) there was no evidence that Anchor intended plaintiff to rely upon any deception and there was no proximate cause between Anchor's actions and plaintiff's injury; (3) the trial court erroneously awarded plaintiff punitive damages as there was no accompanying award of compensatory damages with respect to Anchor's conduct; and (4) punitive damages were improperly awarded because plaintiff failed to demonstrate outrageous behavior or extraordinary circumstances reflecting malice on the part of Anchor.

We affirm in part and reverse in part.

Plaintiff's husband, through his employer, was a member of Anchor and plaintiff was covered as a dependent under his plan. As an Anchor member, plaintiff was bound by the Anchor Subscription Certificate, which describes the extent of medical coverage. This certificate provided up to 45 days of inpatient hospital and physician care for mental health conditions per patient each year when authorized by an Anchor medical staff physician. It also provided up to 20 days of outpatient mental health visits per patient each year at the request of an Anchor medical staff physician.

In 1974, plaintiff fell down a flight of stairs and suffered a permanent injury resulting in her inability to work. Her condition was diagnosed as "bipolar syndrome," which destroys the nerves and cells that control pain in the body. In 1975, plaintiff was being treated by several Anchor physicians; however, her condition necessitated treatment by a psychiatrist or a psychologist, which Anchor could not provide. In 1980, an Anchor-employed staff physician referred plaintiff to Dr. Hector Sabelli, a non-Anchor psychiatrist on staff at Rush-Presbyterian-St. Luke's Medical Center (hereinafter Rush) who saw her as both an inpatient and an outpatient for Anchor.

In 1982, Anchor hired its own staff psychiatrist and psychologist and all of Dr. Sabelli's Anchor referred patients were sent to staff

physicians except plaintiff. On August 11, 1982, Dr. Sabelli entered into an oral agreement with Anchor's medical director, Dr. Michael Stocker, which provided that Dr. Sabelli would continue to treat plaintiff because she was a "difficult" case.

This expansion in coverage, beyond the Anchor Subscription Certificate, was initially disputed by Drs. Sabelli and Stocker in terms of its extent. Dr. Sabelli believed that the oral agreement included both plaintiff's inpatient and outpatient care, while Dr. Stocker believed the extension was confined to 20 additional outpatient visits. A plethora of correspondence between the doctors resulted from the mutual misinterpretation of this oral agreement which was never resolved.

Under the care of Dr. Sabelli, plaintiff was admitted to Rush for psychiatric treatment from November 4, 1983, through February 24, 1984. Relative to this care, she accrued both hospitalization and physician bills. On November 6, 1983, when Anchor was informed of plaintiff's hospitalization, it notified plaintiff and Rush that coverage for her inpatient care was denied. The next day, Rush sent a claim form to Anchor and plaintiff's eligibility for coverage was confirmed by an Anchor employee. This confirmation was never conveyed to plaintiff.

On February 6, 1984, plaintiff received a letter from Dr. Stocker which denied coverage for the Rush bill because plaintiff was being treated by a non-Anchor physician. Upon receipt of Dr. Stocker's letter, and in accordance with Anchor's appeals process, plaintiff's husband wrote Anchor on March 5, 1984, and enumerated reasons why the denial of coverage should be reversed. The appeal was rejected.

Documentation dated April 18, 1984, evidences Anchor's agreement to pay plaintiff's hospitalization bill of $7,965.49 and additionally authorizes payment of Dr. Sabelli's bills. The Rush bill was paid about May 15, 1984. Plaintiff was never informed of this payment. Plaintiff's husband paid three bills totalling $6,787.40 to the Midwest Neurologic Psychiatric Associates, Inc., with which Dr. Sabelli is connected. Anchor admits it failed to notify plaintiff of its prior authorization of payment of Dr. Sabelli's bills.

On April 4, 1985, plaintiff filed an action against Anchor claiming a breach of insurance agreement in failing to pay plaintiff's hospitalization and physician bills from November 4, 1983, to February 24, 1984. Plaintiff alleged a breach of implied covenant of good faith and fair dealing stemming from Anchor's refusal to provide her with continued coverage under Dr. Sabelli's care.

On August 22, 1988, after a settlement regarding the above action had been reached, plaintiff learned that Anchor paid the dis-

puted hospitalization bill and authorized Dr. Sabelli's bills for payment in May 1984. Plaintiff subsequently moved to vacate the settlement and dismissal and filed a separate action.

In this action, plaintiff claimed Anchor violated the Consumer Fraud and Deceptive Business Practices Act (hereinafter the Act) by concealing both its payment of the Rush bill and its authorization of payment of Dr. Sabelli's bills, and by misrepresenting that she still owed Rush and Dr. Sabelli for the bills previously paid and authorized for payment by Anchor.

On November 1, 1990, following a bench trial, judgment was entered for plaintiff against Anchor for violations of the Act. Plaintiff was awarded $6,787.40 in actual damages for the bills of Dr. Sabelli, and $50,000 in punitive damages for Anchor's willful violation of the Act. On December 27, 1990, plaintiff was additionally awarded $22,714.96 in attorney fees and $2,511.28 in costs. Anchor appeals.

■ Initially on appeal, Anchor asserts that because plaintiff failed to prove the public injury element of the Act as required when the action accrued, prior to its amendment in 1990 which abolished the public injury element, judgment was improperly entered against it in violation of the Act. Anchor urges us to accept the myth that the legislative history of this amendment mandates that it only be applied prospectively.

"The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act is to protect consumers *** against fraud and unfair or deceptive acts and practices in the conduct of trade or commerce." (Ill. Ann. Stat., ch. 121½, par. 262, Notes of Decisions, at 201 (Smith-Hurd Supp. 1992).) We remain acutely mindful of the Act's broad, remedial nature and accordingly afford it liberal construction to effectuate its intended purposes. (Ill. Rev. Stat. 1991, ch. 121½, par. 271a.) Our thorough review of the legislative history of the amendment fails to elucidate the parameters of its application.

The spirit of eradicating fraud, which animates the Act, is truly an expansive concept. In accordance with the liberal character of the Act, therefore, we construe the amendment abolishing the public injury requirement to have retroactive effect since there is no legislative evidence to prohibit such an interpretation. We find that plaintiff's failure to prove public injury does not bar recovery.

■ Next, Anchor argues that plaintiff did not prove either Anchor's intention that she rely upon any deception, or the existence of proximate cause between Anchor's actions and plaintiff's injury. We disagree.

The record unequivocally and plentifully evinces Anchor's repeated misrepresentations to plaintiff with respect to the payment of her bills. They need not be revisited in detail here. For our purposes, it is sufficient to note that Anchor sent plaintiff denial of coverage letters both before and after it paid the Rush bill. Further, plaintiff's husband appealed the coverage denial to Anchor's review committee and Anchor representatives told plaintiff's husband that the denial would not be reversed even after the Rush bill had been paid. Additionally, plaintiff filed several amended complaints to which Anchor responded by admitting its denial of coverage for both the Rush bill and for Dr. Sabelli's inpatient charges. All of these admissions were subsequent to the payment of the Rush bill and the authorization of payment of Dr. Sabelli's bills.

Anchor, then, continuously denied coverage of plaintiff's bills, although it both paid the Rush bill and authorized payment of Dr. Sabelli's bills about May 15, 1984. In fact, the Rush bill's eligibility for coverage was confirmed as early as November 7, 1983. Entirely due to Anchor's concealment, plaintiff did not learn that her bills had been paid and authorized for payment until August 22, 1988, more than four years later.

Anchor's express refusal of coverage, after coverage had been approved, was deceptive and misleading. We reject Anchor's position that it did not intend plaintiff to rely on its repeated denials and further believe that plaintiff's reliance on such denials must have surely been anticipated by Anchor. We conclude it absolutely reasonable for plaintiff to have relied upon Anchor's actions.

Relatedly, Anchor maintains that there was no proximate cause between its actions and plaintiff's injury. This assertion is difficult to comprehend. For instance, plaintiff's husband testified that, in reliance on written and verbal coverage denials by Anchor, he paid Dr. Sabelli's bills totalling $6,787.40. This reliance thus directly resulted in plaintiff's injury, the payment of Dr. Sabelli's bills.

Moreover, plaintiff's reliance on Anchor's misrepresentations that it would not pay either the Rush bill or Dr. Sabelli's bills caused plaintiff to accrue legal fees in her attempt to secure payment of bills Anchor had already paid and authorized for payment. We find Anchor's position, that there was no proximate cause, without merit.

■ Finally, Anchor argues that the trial court improperly assessed punitive damages against it. The purpose of punitive damages is not to compensate the plaintiff, but to punish the defendant and to deter similar offenses in the future. Such damages can consequently be awarded only for conduct involving an element of outrage similar

to that normally found in crime. The conduct must be outrageous, *i.e.*, defendant's acts are done with an "evil motive" or with "reckless indifference to the rights of others." (Restatement (Second) of Torts §908, Comment *b*, at 464-65 (1979).) It is entirely within the province of the trier of fact to determine whether an award of punitive damages is appropriate and this determination will not be disturbed absent an abuse of discretion. *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834, 846.

In *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, our supreme court, in keeping with the Restatement, described the necessary degree of culpability which triggers the imposition of punitive damages. The court characterized acts warranting these damages as "willful and wanton misconduct 'approach[ing] the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it.' " *Loitz*, 138 Ill. 2d at 416, quoting *Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 457; see also *Spires v. Mooney Motors, Inc.* (1992), 229 Ill. App. 3d 917.

Anchor's misrepresentations to plaintiff are well documented and a repeated recitation of them is unnecessary. Its conduct, leading plaintiff to believe it would not pay bills it had already agreed to cover, undoubtedly caused plaintiff great hardship and distress. Even with this in mind, however, we do not believe that Anchor's actions, although accurately characterized as misleading and deceptive, constitute "willful and wanton misconduct" rising to "the degree of moral blame attached to intentional harm."

Anchor's failure to communicate the coverage approval for her bills to plaintiff more reasonably implies negligence. "A state of mind different from that needed in ordinary and gross negligence is required" to justify an award of punitive damages. (*Bresland v. Ideal Roller & Graphics Co.* (1986), 150 Ill. App. 3d 445, 458.) We find compensatory damages to be sufficient in this instance and accordingly conclude the aggravated circumstances essential to support plaintiff's supplemental recovery absent. The trial court's grant of punitive damages is reversed.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

JIGANTI, P.J., and HOFFMAN, J., concur.