**L.S. HEATH & SON, INC.,**
**Plaintiff–Appellant,**

v.

**AT & T INFORMATION SYSTEMS,**
**INC., Defendant–Appellee.**

No. 92–3554.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1993.

Decided Oct. 12, 1993.

As Amended on Denial of Rehearing
Dec. 8, 1993.

**564**

Irving S. Capitel, Myron E. Siegel, T. Gregory Mieczynski (argued), Siegel, Lynn & Capitel, Northbrook, IL, Theodore J. Mac-Donald, Jr., James W. McConkey, Burroughs, Hepler, Broom, MacDonald & Hebrank, Edwardsville, IL, for plaintiff-appellant.

Kenneth J. Mallin, Bruce D. Ryder, Louis F. Bonacorsi (argued), Ketrina G. Bakewell, Veronica A. Gioia, Coburn & Croft, St. Louis, MO, Peter A. Zamis, Gary L. Taylor, Rathje, Woodward, Dyer & Hurt, Wheaton, IL, for defendant-appellee.

Before BAUER, CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

L.S. Heath & Sons (Heath) brought this action against AT & T Information Systems (AT & T) alleging, *inter alia,* that AT & T breached implied and express warranties and committed common-law and statutory fraud in the sale of a computer network. The suit was removed to federal court and AT & T counterclaimed on the contract. The district court granted summary judgment in favor of AT & T on its counterclaims and subsequently granted summary judgment against Heath on each of its claims. We have jurisdiction pursuant to 28 U.S.C. §§ 1332 & 1291. We affirm in part, reverse in part and remand.

## I.

Heath is a manufacturer of chocolate products, incorporated and with its principal place of business in Illinois. In 1984, Heath decided that its current computer system was becoming outmoded and resolved to upgrade and enhance its computer and telecommunications capabilities. It therefore established an executive committee to research the needs of the company and to solicit sales proposals from interested vendors. Honeywell, IBM and AT & T were among the vendors submitting bids.

AT & T is a Delaware corporation with its principal place of business in New Jersey. In 1984, AT & T was just entering the computer market and, in preparing its bid, spent a great deal of time gathering information about Heath and Heath's computer and telecommunication needs.. Two representatives of AT & T were instrumental in working with Heath and in preparing AT & T's proposal—Account Executive Tim Keith and Technical Consultant Ed Hein. On August 3, 1984, AT & T presented its final Recommendation and Proposal (Recommendation) to the executive committee. The Recommendation restated Heath's eight main objectives [1] and provided

---

1. Heath's main objectives, as restated in AT & T's Recommendation, were as follows:
 - INTERACTIVE SYSTEM—To convert from a primarily batch mode system to an interactive system providing on-line real time information input, processing and output.
 - DISTRIBUTED PROCESSING—To provide for processing, storage and access at the West Plant and other designated locations to allow for main CPU shut down while maintaining processing capability. Through the System 75, each of the distributed processors will still be able to access and update the main CPU during normal office hours.
 - REAL TIME INFORMATION AVAILABILITY—To provide on-line access to actual current information for designated personnel.
 - OPEN ARCHITECTURE—To initially install a system that will facilitate future growth, enhancements and additions without a major equipment or software change.
 - GROWTH—To implement a system capable of expansion to support your increasing voice and data requirements.
 - PORTABILITY—To build the new system around hardware and software that can be interchanged and, if necessary, can be economically physically moved.

that "[s]tarting with a System 75 as the backbone we will progressively build to a complete intregated [sic] data processing and voice/data communications network that satisfies all of your aforementioned objectives. AT & T can make this statement—AT & T–IS can provide from *one* source all of your voice and data needs."

The Recommendation then went on to propose a phased implementation schedule whereby the network would be assembled and programmed in six phases. By the sixth phase of implementation, to be completed by February 1, 1986, the network would consist of a 3B2 computer processor at Heath's plant, with the larger 3B5 processor to be located at the office facility; a System 75 to link the computers to the users; a protocol converter to enable the AT & T network to communicate with Heath's existing IBM System 3 computer; 3 printers and 17 terminals;[2] and numerous software applications.

Heath agreed to the design, and a two-page Master Agreement was signed by the parties in September and October of 1984. The Master Agreement did not identify any prices, products, services, software, applications or systems, but simply stated that the agreement would cover all future purchases.

AT & T began to install the system and Heath ordered supplemental equipment as recommended by AT & T. For each piece of equipment purchased, Heath would sign a Computer Systems Amendment for the specific products purchased. In all, there were six such amendments, involving at least 35 additional products.

In 1985, the project was progressing relatively smoothly, and AT & T approached Heath about using Heath and its computer system in a national advertising campaign consisting of print and video advertisements.

- PHASED TRANSITION—A must. Any provided system will be implemented in logical phases that will allow budgeting, program assurance, new user training and be responsive to your developing needs.
- PARTNERSHIP/ONE VENDOR—To form an on-going partnership with *one vendor* to plan and implement an integrated information system.

The advertisements and brochures emphasized the benefits and flexibility of the integrated voice/data system AT & T was providing Heath. For instance, the magazine ad run by AT & T featured Heath executives explaining why Heath selected AT & T's System 75, stating that "the system [AT & T] proposed could easily accommodate internal growth and technological change.... [and] [w]e can expand our system, add new products, and incorporate new technology as it becomes available...." The AT & T brochures also stated that "AT & T is designing and installing a fully integrated communications and information system custom-tailored to Heath's long-term needs."[3]

In 1986, however, the project apparently began experiencing difficulties. It was determined that the 3B5 processor did not have sufficient memory to perform the tasks desired by Heath and the processor was upgraded to a larger 3B15. Even with this upgrade, however, Heath's review of the system suggested that the processor was undersized to perform all of the desired applications and that the strain on the processor's capacity caused the system to slow down when in use. There were also problems with the protocol converter used to communicate between the new system and Heath's old IBM System 3.

By the end of 1987, the system was still not working as Heath had anticipated. Therefore, on December 23, 1987, Heath served notice on AT & T and formally demanded a cure within seven days or it would revoke its acceptance of the computer and sue for incidental and consequential damages. When AT & T did not respond to the demand for a cure, Heath informed AT & T on January 4, 1988, that it was formally revoking its acceptance.

2. Although only 17 terminals were initially configured, there was no stated limit to the number of users, and the Recommendation stated that terminals could be added for expanding the number of users at Heath's facilities.

3. The record also contains an article published in late 1984 or early 1985 in *Focus*, an internal AT & T publication, entitled *A Sweet Mixture: An Integrated Voice and Data System*, detailing the selling of the System 75 to Heath by AT & T.

Heath then filed this suit in Illinois state court on January 20, 1988, and AT & T removed the action to federal court on diversity grounds. Heath's First Amended Complaint raised eight causes of action against AT & T: (1) breach of implied warranty of fitness for a particular purpose; (2) breach of implied warranty of merchantability; (3) breach of express warranties as to the ability of AT & T's equipment and software to meet Heath's objectives; (4) breach of a partnership agreement; (5) violation of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.*; (6) common-law fraud; and (7) violation of the Lanham Act, 15 U.S.C. § 1125.

AT & T counterclaimed against Heath, arguing that it was entitled to the price of the system under the provisions of the Uniform Commercial Code (U.C.C.) and on a common-law breach of contract theory. In separate motions, AT & T moved for summary judgment on its counterclaims and on the claims raised by Heath. On April 6, 1992, the district court granted AT & T's motion for summary judgment on its counterclaims. Heath filed a motion for reconsideration on April 16, 1992, but that motion was denied in a memorandum and order also granting AT & T's motion for summary judgment with respect to all of Heath's claims. Heath appeals.

## II.

Our review of a grant of summary judgment is *de novo*, taking all facts and inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The issue is simply whether there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Heath contends that the district court erred in granting summary judgment on AT & T's counterclaims, and that the court likewise erred in granting summary judgment against Heath on its breach of warranty claims (counts I–III), its Illinois Consumer Fraud Act claim (count V), its common-law fraud claim (count VI) and its

Lanham Act claim (count VII). We will address each of this issues in turn.

### A. *AT & T's Counterclaims*

The district court granted the defendant's motion for summary judgment on its counterclaims, holding that Heath breached the contract when it failed to make payments to AT & T for the computer network. The court noted that Heath claimed that it had properly revoked acceptance of the equipment under the provisions of the U.C.C. and thus was under no obligation to make the payments that AT & T cited as being in arrears. But the only communication presented by Heath to support this revocation claim was the December 23rd letter stating that, if a cure was not forthcoming within seven days, Heath would revoke. The court concluded that this letter may have been notification of a breach but that it was not a revocation. Hence, the court granted AT & T's motion and awarded judgment in its favor in the amount of $238,773.49 plus prejudgment interest.

Heath filed a motion for reconsideration arguing that the court failed to consider the letter of January 4, 1988, specifically revoking acceptance, and instead only addressed the earlier letter demanding a cure. In response to this motion, the district court acknowledged that the January 4th letter was a revocation of acceptance. Nonetheless, the court denied the motion for reconsideration because Heath had not brought this letter to the court's attention, but rather had relied as proof of revocation on the December 23rd letter demanding a cure. Indeed, the court noted that Heath had not filed the January 4th letter in response to AT & T's motion for summary judgment on its counterclaims, but had filed this letter in support of its summary judgment motion on its own claims— well after the counterclaims motion had become ripe for consideration. Given that Heath failed to present a genuine issue of fact as to revocation when the motion for summary judgment was ripe for adjudication, the court concluded that Heath's belated reference to the revocation letter could not preclude summary judgment.

Heath contends that summary judgment was not warranted because (1) there was an issue of fact whether Heath had been fraudulently induced to enter the contract, (2) the revocation letter of January 4 was a matter of record and the district court was not justified in ignoring it and (3) the December 23rd letter, which Heath did reference to support its claim that it had revoked acceptance, was sufficient to establish revocation.

■ As to Heath's claim that summary judgment was precluded because there was a genuine issue whether it had been fraudulently induced to enter the contract, we note that Heath never pleaded fraudulent inducement as an affirmative defense or raised this issue in its opposition to AT & T's motion for summary judgment. Consequently, Heath has waived this argument as to AT & T's counterclaims. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir.1991); *Publishers Resource, Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir.1985).

Heath asserts that the court erred in not considering the January 4th letter because Federal Rule of Civil Procedure 56 does not require counsel to single out documents to the court in order to preclude summary judgment, but only demands that such documents be filed and made part of the record before the court. In any event, Heath emphasizes that it did make reference to the January 4th letter in other filings with the court and that the record in this case was not so voluminous as to preclude the court from reviewing the documents on file before granting summary judgment.

Heath relies on *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir.1980), and *In re Hart*, 130 B.R. 817, 823 (Bankr. N.D.Ind.1991), which can both be traced to *Higgenbotham v. Ochsner Foundation Hospital*, 607 F.2d 653 (5th Cir.1979), for the principle that a court must consider all documents of record, not only those relied upon by counsel and referenced to the court, before granting summary judgment. We note, however, that this line of cases is in tension with the Supreme Court's more recent summary judgment jurisprudence, embodied in *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Indeed, in *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n. 8 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992), the Fifth Circuit overruled *Higgenbotham* and *Keiser* and held that the non-moving party must designate or refer to evidence in response to a motion for summary judgment for the evidence to be "part of the competent summary judgment record before the court." *Id.* at 916 (quoting *Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988)). In *Skotak*, the non-moving party had previously filed medical journal articles in response to a motion to dismiss for lack of personal jurisdiction. In response to a motion for summary judgment more than a year later, the non-movant did not specifically refer to these articles. The court of appeals indicated that the articles were part of the evidence before the district court and would, if referenced, have precluded summary judgment. But the Fifth Circuit held that the failure to reference the articles in response to the motion for summary judgment made consideration of them as part of the competent summary judgment record discretionary with the district court.

■ Other circuits have also indicated that the district court need not wade through the record on a motion for summary judgment. These courts state that it is the obligation of the non-moving party to present evidence indicating that there is a genuine issue of fact. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 991 n. 2 (9th Cir.1991); *Inter-royal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). We find this view persuasive and conclude that a district court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment. Instead, the court can rely upon the non-moving party to show such a dispute if one exists.

■ In this case, Heath did not reference the January 4th revocation letter to the court—indeed, the document in question was not even before the court when the motion for summary judgment on the counterclaims became ripe for adjudication. Heath instead relied upon the December 23rd letter in its effort to show that there was a genuine issue of fact to preclude summary judgment. Thus, the January 4th letter, albeit a facially valid revocation of acceptance, was not part of the summary judgment record and the district court did not abuse its discretion in refusing to consider it.

■ Finally, Heath asserts that, even if the district court was justified in refusing to consider the January 4th revocation letter, the court nonetheless erred in concluding that the December 23rd letter—the letter Heath did reference as evidence of revocation—did not amount to a revocation. This claim is without merit. The December letter was solely a demand for a cure, stating that "[i]n the event a cure is not effected, to the extent that L.S. Heath & Sons, Inc. may have accepted any of the items, L.S. Heath & Sons, Inc. may revoke their acceptance of any such equipment." The letter clearly makes revocation conditional upon AT & T's failure to effect a cure and thus does not establish revocation.

■ In any event, even if the January 4th letter were considered and held to revoke acceptance of the equipment under § 2–608 of the U.C.C. (codified at N.J.Rev.Stat. § 12A:2–608),[4] that revocation would be inoperative. Under the U.C.C., the continued use of goods after acceptance has purportedly been revoked is inconsistent with, and invalidates, the supposed revocation unless such use was necessary to avoid substantial hardship. *Fablok Mills, Inc. v. Cocker Mach. & Foundry Co.*, 310 A.2d 491, 125 N.J.Super. 251, *petition for certification denied*, 315 A.2d 405, 64 N.J. 317 (1973); *accord Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 75 (2d Cir.1986). The record indicates that Heath continued to use the AT & T system for word processing

until the last quarter of 1989. At that time Heath purchased personal computers for those using the AT & T system for word processing and placed the AT & T system in storage—not to be used again. Heath contends that this continued use was reasonable and necessary to mitigate damages. A buyer who revokes, however, is not permitted to dawdle for well over a year before obtaining replacements, but must search for and obtain any necessary replacements with dispatch. *Computerized Radiological*, 786 F.2d at 75. The continued use here was not justified and thus worked to invalidate any purported revocation.

Consequently, we affirm the grant of summary judgment on AT & T's counterclaims.

### B. *Breach of Warranty Claims*

The district court granted summary judgment against Heath's breach of warranty claims on the ground that all warranties except those expressly contained in the agreement had been disclaimed by the provision to that effect in the Master Agreement. The court concluded that the Master Agreement was an integrated document because it contained a merger clause. The only express warranty found in that document, according to the court, was AT & T's representation that the equipment would be in good working order in accordance with AT & T specifications. The court then held that, because there was no evidence that the equipment was not in good working order—only evidence that it could not perform as promised—summary judgment was appropriate.

Heath contends that summary judgment was not warranted because the agreement between the parties extended beyond the provisions of the Master Agreement and included AT & T's promises before and after the Master Agreement was signed. Heath maintains that there is a genuine factual dispute whether the parties intended the Master Agreement to be the complete and exclusive statement of their agreement. Heath insists that the Master Agreement

---

4. The parties agree that New Jersey law controls the contract claims and that Illinois law controls the fraud claims.

cannot be a complete statement of the agreement because that document omits basic and essential items of information. According to Heath, the Recommendation indicates that the parties intended that AT & T provide a fully integrated, custom-tailored information system meeting all of Heath's stated objectives. Because the Recommendation is part of the agreement between the parties, Heath argues, the district court was remiss in not considering the express warranties found in that document.

Heath relies principally on *Sierra Diesel Injection Service, Inc. v. Burroughs Corp.,* 890 F.2d 108 (9th Cir.1989). In that case, a buyer of computer hardware and software received a letter from the seller stating that its computer could "put your inventory, receivables, and invoicing under complete control." *Id.* at 110. The buyer purchased the computer and signed various form contracts for the hardware, software and maintenance service. When the computer did not perform the invoicing and accounting functions for which it was purchased, the buyer brought suit alleging that the computer company breached the express warranties found in the initial letter as well as the implied warranty of merchantability. The court held that the form contracts did not represent the entire agreement between the parties, despite the existence of a merger clause, but that representations made in the letter were part of the agreement. The court concluded that the disclaimer of warranty in the printed form contracts was ineffective to void the express warranties in the letter. Further, because the disclaimer was not conspicuous, it was also ineffective to void the implied warranty of merchantability.

▮ Consistent with *Sierra Diesel,* we believe that in the present case genuine issues of fact exist to preclude summary judgment on the breach of express warranty claim. On the other hand, summary judgment was proper on the implied warranty

claims. Under the U.C.C. parol evidence rule,

> a writing intended by the parties as a final expression of their agreement ... may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented ... by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

N.J.Rev.Stat. § 12A:2–202. We find initially that the parties did not necessarily intend the Master Agreement to reflect the complete agreement between the parties simply because they included the merger clause. To be sure, the presence of a merger clause is strong evidence that the parties intended the writing to be the complete and exclusive agreement between them, but such a clause is not dispositive. *Sierra Diesel,* 890 F.2d at 112; R. Anderson, Uniform Commercial Code, § 2–202:25 (1983). In order to determine whether the parties intended a writing to be the complete and exclusive agreement between them, a court must compare the writing with the prior negotiations. *Atlantic Northern Airlines, Inc. v. Schwimmer,* 96 A.2d 652, 656, 12 N.J. 293 (1953). If the allegedly integrated writing does not, without reference to another document or other coordinating information, reveal what the basic transaction entailed, then the writing is not integrated. *Sierra Diesel,* 890 F.2d at 113.

▮ Based on this reasoning, the Master Agreement clearly fails to reflect the complete agreement between the parties. The Master Agreement omits subject matter; it does not identify any prices, products, services, software applications or configurations. Further, contrary to AT & T's contentions, the Master Agreement does not reflect the complete agreement even when considered together with the System Amendments.[5]

**5.** AT & T argues that the Master Agreement and System Amendments together constitute the final agreement between the parties based on case law stating that documents that refer to or incorporate each other must be analyzed together. Appellee Pet. at 5–6. Such reference or incorporation is not clearly evidenced by the Master Agreement's integration clause. The integration

clause contained in the Master Agreement is as follows:

> THIS IS THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE PRODUCTS AND SERVICES HEREUNDER AND SUPERSEDES ALL PRIOR AGREEMENTS, PROPOSALS OR UNDER-

Neither the Master nor its Amendments reflect the fact that the parties intended for AT & T to custom-tailor and install for Heath a fully integrated information system which would solve specific problems and perform specific applications. Indeed, under AT & T's theory, it could have ended its relationship with Heath without breaching the contract after performing on the first Amendment, since the Master Agreement does not articulate what products and services must ultimately be included in the Amendments. If nothing else, it would seem that the parties would have opted for a contractual arrangement less open-ended than that contemplated by the Master Agreement and Amendments if they merely wished to ensure the delivery of discrete products and services unrelated to some larger goal.

The Recommendation, with its detailed discussion of this information and with a specific time frame for implementing and completing the proposed transaction, provides the terms the Master Agreement and Amendments lack. For purposes of summary judgment, however, we do not have to conclude definitively that the Recommendation is part of the agreement, but simply must find, as we do, that the Master Agreement and System Amendments do not reflect the complete and exclusive agreement between the parties.

■■■ Although we do not conclude that the Recommendation is part of the agreement—a question we leave for the trier of fact—we shall assume, *arguendo*, that key terms contained in the Recommendation do constitute part of the agreement between Heath and AT & T. We then find that AT & T's statement that its "complete intregated [sic] data processing and voice/data communications network [will] satisf[y] all of your [Heath's] aforementioned objectives," may amount to an express warranty. For § 12A:2–313 provides that express warranties are created when

> Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

A statement can amount to a warranty, even if unintended to be such by the seller, "if it could fairly be understood ... to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance." *Gladden v. Cadillac Motor Car Div., General Motors Corp.*, 416 A.2d 394, 396, 83 N.J. 320 (1980). The statement made in the Recommendation clearly could be understood as an assurance that the computer network sold to Heath would perform up to certain standards—in particular, that it would satisfy all of Heath's objectives in purchasing the network. And there is no question that such assurances had a "natural tendency" to induce Heath to select AT & T for its computer and telecommunications needs and, thus, were a significant part of the basis of the bargain. *Id.*

■■■ AT & T, however, relies upon the disclaimer provision in the Master Agreement and contends that, even if those assurances in the Recommendation could be considered express warranties, they were effectively disclaimed. But under U.C.C. § 2–316, a warranty disclaimer inconsistent with an express warranty is inoperative. N.J.Rev.Stat. 12A:2–316; *Gladden*, 416 A.2d at 398; *accord Sierra Diesel*, 890 F.2d at 113.

---

STANDINGS WHETHER WRITTEN OR ORAL.
It is not entirely clear exactly what the subject of the sentence, "THIS," refers to. "THIS" may refer to the Master Agreement alone or to the Agreement together with the Amendments or "THIS" may include other documents. The Master Agreement, if it refers to or incorporates the System Amendments at all, does so by declaring its application "to any order for the provision or sale of products and services to Customer [Heath] by AT & T-IS which is placed by Customer on or after the date Customer signs this Agreement. Appellee B.R. at 25 (quoting from Master Agreement). That is, even though the Master Agreement does not appear to use the word "amendments," the Master Agreement arguably governs the sale of specific products and services contemplated in each of the Amendments because Heath placed these sales "on or after" the date it signed the Agreement. The Amendments reference the Master Agreement more explicitly, each stating that "Customer Requests The Provision Of The Following Products Subject To The Terms And Conditions Of The Above–Referenced Contract...." *Id.* at 26 (quoting from Systems Amendments).

AT & T argues in the alternative that, even if there were express warranties in the Recommendation, Heath failed to present evidence that any of the warranties were breached. On the other hand, Heath alleges, for example, that the network did not completely integrate Heath's voice and data systems and that the system was not capable of expansion—one of Heath's stated objectives in purchasing the System 75.

As to integration, AT & T counters that the network did integrate voice and data communications because Heath's telecommunications system and data processing system ran over the same wires. Although the record does not explain precisely what "integration" means, we think that there is nonetheless evidence to indicate that "complete integration" was not provided as promised. In his testimony, Ed Hein of AT & T stated that AT & T did not have products which would "integrate" voice and data, but that AT & T did have products that would allow simultaneous transmission of voice and data. According to Hein, however, "that's not integration." He went on to distinguish between "true integration," involving a system that had both voice and data capabilities, and a system entailing "simultaneous transmissions over telephone wires." Although there may be a distinction between "true integration," as explained by Hein, and "complete integration," as purportedly promised by AT & T, we think that the purported existence of an express warranty of integration presents a genuine issue of fact.

There also seems to be evidence suggesting that the AT & T system did not have the ability to expand as promised in the Recommendation to Heath. Therefore, because there are genuine issues of fact precluding summary judgment on the breach of express warranty claim, we believe that the district court's decision on this count must be reversed and remanded.

 With respect to the breach of implied warranty claims, however, we agree with the district court that the disclaimer was effective. The implied warranty of merchantability may be disclaimed if the word "merchantability" is used in the written document and is "conspicuous." This means

"that a reasonable person against whom it is to operate ought to have noticed it." *Gindy Mfg. Corp. v. Cardinale Trucking Corp.*, 268 A.2d 345, 349, 111 N.J.Super. 383 (1970). In general, a disclaimer is conspicuous if it is in larger print or otherwise appears in contrasting type or color. *Id.* To disclaim the implied warranty of fitness for a particular purpose, on the other hand, the writing need not specifically mention "fitness for a particular purpose" but the disclaimer must be conspicuous.

 The disclaimer in the Master Agreement provides in capital letters under the heading **"WARRANTY EXCLUSIONS FOR TERM PLANS OR PURCHASE"**:

EXCEPT AS SPECIFICALLY MADE HEREIN, AT & T–IS AND ITS AFFILIATED SUBCONTRACTOR AND SUPPLIERS MAKE NO WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIM ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

This writing specifically mentions "merchantability" and, although not required, also mentions "fitness for a particular purpose." In addition, the use of capital letters under the black-letter heading **"WARRANTY EXCLUSIONS"** makes the writing conspicuous. This seems especially true given Heath's sophistication in commercial dealings. *See H.B. Fuller Co. v. Kinetic Sys., Inc.*, 932 F.2d 681, 689 (7th Cir.1991) (applying Wisconsin law). Therefore, we conclude that the provision of the Master Agreement amounted to a valid disclaimer of the implied warranties of merchantability and fitness for a particular purpose and that summary judgment as to these counts was appropriate.

### C. Common–Law Fraud Claim

The district court also granted AT & T summary judgment on Heath's common-law fraud claim. The court found that Heath's claim was premised on the allegation that AT & T's system was undersized and that AT & T had allegedly failed to acquire the information necessary to properly assess Heath's needs at the time that AT & T assured Heath that it would accommodate Heath's objectives. In holding for AT & T, the court

found that Heath had not shown that AT & T failed to assess Heath's needs "because of some desire to sell Heath computer equipment regardless of whether the equipment worked or not...." Based on this finding, the court concluded that Heath had not shown that AT & T possessed the requisite intent when it made its assurances.

Heath contends that there was sufficient evidence to present a genuine issue of fact and preclude summary judgment on this claim. It argues that the purportedly false statements in the Recommendation to the effect that AT & T's system would meet all of Heath's objectives were made with knowledge of their falsity or with reckless disregard for whether the statements were true or not. Moreover, Heath maintains that the statements were of such a nature and were made in such a context that the only inference one might draw from them is that they were made knowingly and for the purpose of inducing reliance.

■■■ To establish an action for fraud, the plaintiff must show, by clear and convincing evidence, *Hofmann v. Hofmann,* 68 Ill.Dec. 593, 600, 446 N.E.2d 499, 506, 94 Ill.2d 205 (1983), the following: (1) that the defendant made a statement; (2) of a material nature as opposed to opinion; (3) that was untrue; (4) that was known by the defendant to be untrue, believed by the defendant to be untrue, or made with culpable ignorance of its truth or falsity; (5) that was relied upon by the plaintiff to its detriment; (6) that was made for the purpose of inducing reliance; and (7) that the plaintiff's reliance upon this statement led to its injury. *Buechin v. Ogden Chrysler–Plymouth, Inc.,* 111 Ill.Dec. 35, 40, 511 N.E.2d 1330, 1335, 159 Ill.App.3d 237 (2d Dist.1987).

In its First Amended Complaint, Heath alleged that AT & T made the following purportedly fraudulent statements to Heath:

 (a) AT & T had and would provide special expertise in converting application software from an IBM System 3 operating environment to an AT & T Unix operating environment;

 (b) AT & T would form a partnership with Heath to solve problems anticipated in converting from an IBM System 3 oper-

ating environment to an AT & T Unix operating environment;

 (c) AT & T's equipment had the capacity and ability to perform functions such as on-line order entry and manufacturing monitoring;

 (d) AT & T had and would provide special expertise in providing equipment and skills to satisfy Heath's data processing needs and solve problems in connection therewith;

 (e) AT & T had and would provide integrated voice communications and data processing capability;

 (f) AT & T System 75 would work directly with an AT & T 3B5 Computer to speed voice and data communications between Heath's main office and manufacturing facilities;

 (g) From the CEO on down, AT & T's system would provide Heath decision-makers with the information they needed right at their fingertips (desk top terminals);

 (h) Only AT & T had the technology and service to meet Heath's needs; and

 (i) AT & T would design and install a fully integrated communications and information system custom tailored to Heath's long term needs.

(Emphasis omitted).

■■■ To substantiate its claims that AT & T made false representations to Heath about the size and ability of AT & T's computer system, Heath noted that AT & T's computer specialist James Laietta admitted that he "had no basis" for configuring the system the way he had recommended. He also conceded that he was simply relying on preliminary information to configure a "reference" or a middle configuration. Contrary to AT & T's express representations in its Recommendation, this configuration, according to Heath, turned out to be grossly undersized to achieve all of Heath's objectives. Because AT & T gave its assurances knowing that the configuration was based only upon preliminary information, Heath contends, there is evidence that the statements were made with reckless disregard for the truth.

■ Heath has failed to establish, however, that the statements were made with knowledge of the fact that the configuration recommended by Laietta was based only on preliminary information. In this regard, Laietta stated that he had never requested any additional information from Ed Hein or from any other member of AT & T's team serving Heath's account. Laietta also testified that additional information was not necessary and that he never informed those preparing the Recommendation that the information given to him to prepare the configuration was only preliminary. Hence, there is no evidence that those preparing the Recommendation knew that the configuration was based only on preliminary information and thus Heath has not shown that AT & T made its allegedly fraudulent statements with reckless disregard for the question whether the system was capable of performing Heath's objectives. At most, this evidence may suggest that AT & T was negligent, perhaps even grossly so, in the preparation of the computer system and in representing to Heath that the system was configured to satisfy Heath's needs. But negligence does not translate into fraudulent intent. *See Brazell v. First Nat. Bank and Trust Co.,* 982 F.2d 206, 208–09 (7th Cir. 1992).

■ Although the district court was correct in concluding that these representations based on inadequate information did not evidence an intent to defraud, we believe that there is enough evidence in the record to present a factual issue whether AT & T's representations about the computer system were fraudulent. As we have noted with respect to express warranties, AT & T's Recommendation states that AT & T will provide "a complete intregated [sic] data processing and voice/data communications network that satisfies all of your aforementioned objectives." Hein later admitted, however, that, at the time the Recommendation was made, AT & T "didn't have products that would integrate voice and data.... True integration. We had products that would allow simultaneous voice and data, but that's not integration." But, as noted, there is a factual issue as to the difference, if any, between "complete integration" and "true integra-

tion." If we assume for purposes of summary judgment that there is no difference between those two terms, it becomes clear that, when AT & T promised a completely integrated system, it knew that such a statement was untrue. Indeed, even if there is a difference between "complete" and "true" integration, the representation about integration nonetheless may be fraudulent if it deceptively and purposefully omits material information. *See Buechin,* 111 Ill.Dec. at 41, 511 N.E.2d at 1336.

■ Finally, there can be no question that AT & T's statement was made for the purpose of inducing reliance. Making a knowingly false statement, especially in the submission of a bid, is ample evidence of intent to induce reliance on the part of the person to whom the statement is made. *Luciani v. Bestor,* 62 Ill.Dec. 501, 509, 436 N.E.2d 251, 259, 106 Ill.App.3d 878 (3d Dist. 1982) (proof that maker of statement knows or believes it to be untrue is sufficient to establish prima facie case of fraud on element of intent). Accordingly, we believe that the grant of summary judgment on the common-law fraud count must be reversed and remanded.

D. *Illinois Consumer Fraud and Deceptive Practices Act Claim*

Heath also brought a claim under the Illinois Consumer Fraud and Deceptive Practices Act, which provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2. Persons injured as a result of a violation of this provision may bring a private action against the violator. 815 ILCS 505/10a.

The district court granted AT & T summary judgment on this claim on the ground that Heath had failed to show proof of public injury stemming from a violation of the Act. The court noted that the Act had been amended to eliminate a public injury requirement as a requisite to suit. But the court held that this amendment applied only prospectively, relying on *A. Kush & Associates, Ltd. v. American States Insurance Co.*, 927 F.2d 929, 938–39 (7th Cir.1991). Because the events here took place before the 1990 amendment, the court concluded that Heath was required to show public injury—namely that AT & T routinely sold computers on a fraudulent basis.

Heath contends that there was no requirement to show public injury and cites *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Insurance Co.*, 962 F.2d 628, 638 (7th Cir.1992), together with recent Illinois precedent holding that the 1990 amendment applies retroactively. AT & T, on the other hand, although it recognizes that there are two inconsistent Seventh Circuit cases as to the retroactive effect of the 1990 amendment (*A. Kush* and *Hardin*), asserts that *A. Kush* is still the law because it has not been overruled en banc or under the procedures outlined in Circuit Rule 40(f), citing *National Cycle, Inc. v. Savoy Reinsurance Co.*, 938 F.2d 61, 64 (7th Cir.1991).

 Of course, federal courts are bound to state court precedents in interpreting state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In the absence of a decision by the highest state court, we should decide the matter in the way we divine that the highest state court would rule if the issue were squarely presented to it. Decisions of intermediate appellate state courts generally control unless there are persuasive indications that the highest state court would decide the issue differently. *Hicks v. Feiock*, 485 U.S. 624, 630 n. 3, 108 S.Ct. 1423, 1428 n. 3, 99 L.Ed.2d 721 (1988) (quoting *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237–38, 61 S.Ct. 179, 183–84, 85 L.Ed. 139 (1940)).

At the time *A. Kush* was decided, no state court had spoken to the issue of the amend-

ment's retroactive effect and the *A. Kush* panel was therefore forced to make its best guess as to how the Illinois Supreme Court would decide the issue. The panel held that "absent an express statement from the legislature, amendments to statutes will not be applied retroactively." 927 F.2d at 939 (quoting *Davenport v. A.C. Davenport & Son Co.*, 903 F.2d 1139, 1141 n. 5 (7th Cir.1990)). Absent such a legislative statement, the panel held that the amendment had prospective effect only.

In *Hardin*, a different panel of this court came to the opposite conclusion. The panel was apparently unaware of *A. Kush* and thus addressed the issue as a matter of first impression. The panel quoted from *People v. Badoud*, 118 Ill.Dec. 407, 410, 521 N.E.2d 884, 887, 122 Ill.2d 50 (1988), for the principle of statutory construction that "[w]here, as here, an amendment is enacted soon after controversies have arisen regarding the statute amended, it is logical and reasonable to regard the amendment as a legislative *interpretation* of the original statute." 962 F.2d at 638 (emphasis in original). In fact, there *had* been controversy over whether a showing of public injury was required. This was brought to a head by our decision in *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033 (7th Cir.1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1123, 107 L.Ed.2d 1030 (1990). There we held that such a showing was indeed necessary under the Consumer Act. The panel in *Hardin* concluded that the 1990 amendment was likely intended to be a clarification rather than a substantive change in the law. Therefore, the panel held that the Illinois Supreme Court would probably conclude that the amendment was retroactive.

Since then, the Illinois appellate courts which have addressed the issue have all concluded that the 1990 amendment is retroactive, relying in large part on *Badoud*'s "responsive amendment" principle. *See Johnston v. Anchor Org. for Health Maintenance*, 190 Ill.Dec. 268, 621 N.E.2d 137, 250 Ill. App.3d 393 (1st Dist.1993); *Zinser v. Rose*, 185 Ill.Dec. 574, 614 N.E.2d 1259, 245 Ill. App.3d 881 (3d Dist.1993); *Royal Imperial Group, Ltd. v. Joseph Blumberg & Assoc.*,

181 Ill.Dec. 105, 608 N.E.2d 178, 240 Ill. App.3d 360 (1st Dist.1992); *Rubin v. Marshall Field & Co.,* 173 Ill.Dec. 714, 597 N.E.2d 688, 232 Ill.App.3d 522 (1st Dist. 1992). In the light of this authority, we recently have resolved the inconsistency in our cases in favor of *Hardin* and the retroactive effect of the amendment. *L.R.J. Ryan, Wersi Chicago, Inc. v. Wersi Elec. GMBH and Co.,* 3 F.3d 174, 183 (7th Cir.1993).

Because the district court rejected Heath's Consumer Fraud Act count solely on the ground that Heath had failed to allege and to prove public injury, we do not have that court's view of other aspects of the claim affecting summary judgment. *Id.* We have, however, found that there are genuine issues of fact precluding summary judgment on the common-law fraud claim and those same factual issues are applicable to this claim. Therefore, summary judgment on the Consumer Fraud Act count must also be reversed and remanded.

### E. *The Lanham Act Claim*

Heath also brought a claim under the Lanham Act, 15 U.S.C. § 1125, requesting injunctive relief, damages, attorneys' fees and a public apology on account of AT & T's publication of the 1985 advertisement which began, "Once Heath chose AT & T, all the ingredients came together." Heath alleged that this advertisement misrepresented the system acquired by AT & T and portrayed Heath in a false light.

The district court granted summary judgment on this claim on the ground that Heath consented to the advertisement and that Heath could show no injury stemming from the ad. At the time that the advertisement ran, the court found, the ad representing that Heath endorsed AT & T was not false. In fact, the court noted, Heath specifically approved the advertisement in question. Moreover, the court held that Heath had not shown any possibility of injury, intimating that candy customers do not buy their candy based upon the computer system endorsed by the manufacturer.

■ We agree with the district court and affirm the grant of summary judgment on this claim. There are two bases of liability under the Lanham Act: (1) false representations concerning the origin, association or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress or other device (otherwise known as "false association" or "false endorsement") and (2) false representations in advertising concerning the qualities of goods or services ("false advertising"). *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1108 (9th Cir.1992). Heath's Lanham Act claim can be read as alleging both false advertising and false endorsement. First, Heath alleged that AT & T's ad falsely misrepresented the nature and qualities of AT & T's equipment and services. In order to have standing to allege a false advertising claim, however, the plaintiff must assert a discernible competitive injury. *Id.* at 1109. Because Heath is not in the computer business and thus is not a competitor of AT & T, Heath does not have standing to raise the false advertising claim.

Second, Heath alleges that the ad portrays Heath in a false light and that consumers will assume that Heath is affiliated with AT & T and its product. This false endorsement claim fails as well, however, because the endorsement was not "false"—Heath did give its endorsement and approved the ad.

■ At all events, even if Heath could make out a Lanham Act claim, summary judgment was nonetheless appropriate because Heath failed to offer any evidence that it was entitled to any relief. In order to recover damages for a purported Lanham Act violation, the plaintiff "must demonstrate that it has been damaged by actual consumer reliance on the misleading statements." *Web Printing Controls Co. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1205 (7th Cir.1990) (quoting *Schutt Mfg. Co. v. Riddell, Inc.,* 673 F.2d 202, 206 (7th Cir.1982)). Not surprisingly, Heath has failed to show that any of its chocolate customers jumped ship after reading the computer ad. Moreover, there is no basis for injunctive relief because the ad in question (or any similar ad) is no longer running.

### III.

To summarize, we affirm the grant of summary judgment with respect to AT & T's

counterclaims, the breach of implied warranty claims (counts I & II) and the Lanham Act claim (count VII). We reverse and remand, however, with respect to the breach of express warranty claim (count III), the Consumer Fraud Act claim (count V) and the common law fraud claim (count VI).

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.