**Luqman YACUB, et al., Plaintiffs,**

v.

**SANDOZ PHARMACEUTICALS CORPORATION, et al.,**
**Defendants.**

**No. C–3–96–297.**

United States District Court,
S.D. Ohio,
Western Division.

Dec. 22, 1998.

---

Motion for reconsideration denied, 85 F.Supp.2d 817.

854

Richard Michael Hunt, Hunt, Skilken & Wehner, Dayton, OH, Glenn J. Shrader, Jr., Walker & Walker, Oklahoma City, OK,

Thomas J. Replogle, Skilken & Replogle, Dayton, OH, for Todd Bergert, plaintiffs.

Kerry Carson Green, Dinsmore & Stohl, Cincinnati, OH, for Defendants.

## DECISION AND ENTRY VACATING MARCH 27, 1998, DECISION AND ENTRY (DOC. # 39) IN PART; DEFENDANT SANDOZ PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOC. # 20) OVERRULED; TRIAL DATE ON ALL ISSUES SET FOR OCTOBER 4, 1999.

RICE, Chief Judge.

This litigation arises out of Cheryl Yacub's death, which occurred on February 17, 1991. The Plaintiff, who is her surviving spouse and the administrator of her estate, brings this action on behalf of the estate and Mariam Yacub, his minor child. The Plaintiff contends that the death of Cheryl Yacub (hereinafter "Cheryl Yacub" or "Yacub") was caused by her taking Parlodel, a drug manufactured by Defendant Sandoz Pharmaceuticals Corporation ("Sandoz").[1] His Amended Complaint sets forth, in effect, two claims for relief: a survivorship claim on behalf of the estate, and a loss of consortium claim on behalf of Mariam Yacub.[2]

In a March 27, 1998, Decision and Entry (Doc. # 39), the Court sustained in part and overruled in part a Motion for Summary Judgment (Doc. # 20) filed by Sandoz. The Court sustained the Motion to the extent it sought summary judgment on the Plaintiff's survivorship claim, which the Court found time-barred by the statute of limitations, but overruled the Motion to the extent it sought summary judgment on the loss of consortium claim. The Court also noted that it would file an Expanded Opinion, with reasoning and citation to au-

1. Sandoz is now known as Novartis Pharmaceuticals Corporation. The Court previously dismissed Sandoz, Ltd., Sandoz' Swiss parent corporation (the other Defendant named herein), for want of personal jurisdiction. *See* Doc. # 28.

2. Although the Plaintiff's Amended Complaint contains four claims for relief, the Court noted in its March 27, 1998, Decision and Entry that they set forth different legal theories supporting the survivorship and loss of consortium claims. *See* Doc. # 39.

thority, supporting its decision concerning the survivorship claim.[3] Upon further reflection, however, the Court concludes that the Plaintiff's survivorship claim is not barred by the applicable statute of limitations. Consequently, for the following reasons, the Court hereby vacates its March 27, 1998, decision and entry to the extent it granted Sandoz summary judgment on the Plaintiff's survivorship claim, and overrules Sandoz' Motion on the issue.

## I. Factual and Procedural Background

Cheryl Yacub discovered that she was pregnant in May, 1990. (Yacub depo. at 28). Prior to her pregnancy, Yacub had no history of serious health problems and no history of headaches. (Id. at 23). Her pregnancy was relatively uneventful, and she experienced no problems other than a bladder infection, which her doctor treated with antibiotics. (Id. at 28). Yacub gave birth to Mariam Yacub by caesarian section on February 5, 1991, at the Timken Mercy Medical Center. (Id. at 30). She progressed normally following the delivery and had no complaints of headaches while at the hospital. (Id. at 32). Yacub was discharged on February 8, 1991, and prescribed Parlodel to suppress postpartum lactation. (Id. at 40, 45).

Yacub took the medication as directed following her release from the hospital. (Id. at 46). On February 11, 1991, she first complained to the Plaintiff about having a headache that radiated from behind her ear. (Id. at 47). She explained that the pain was unlike any headache she ever had experienced before. (Id. at Exh. 1, p. 3). The following day, the Plaintiff went with Yacub to the Timken Mercy Medical Center's Emergency Room. (Yacub depo. at 51–52). The Yacubs told the emergency

room doctor that Cheryl Yacub was taking Parlodel and Tylenol. (Id. at 53). The doctor took a CAT scan, which was negative, and prescribed Darvocet for the headaches. (Id. at 54).

After returning home, Yacub continued experiencing headaches, which became even worse. She also experienced a visual disturbance "like a bright light, [like] Christmas lights." (Id. at 59). At that time, Cheryl Yacub wondered whether her headaches were being caused by contamination of her epidural. (Id. at 60). The headaches continued through February 16, 1991, and she continued taking her regular doses of Parlodel. (Id. at 61–63, 67). Yacub "was in such a throbbing pain" that she had difficulty moving. (Id. at 69). She spoke with Dr. Jagadeesan, her physician, on the telephone, and the doctor told her to make an appointment with a neurologist the following day. (Id. at 71). Approximately one hour later, Yacub began convulsing while making baby formula and suffered a seizure. (Id. at 72). She was transported to the Timken Mercy emergency room and later placed in the intensive care unit. (Id. at 73).

One of the doctors at the medical center mentioned that Yacub's illness might be due to meningitis or venus thrombosis. (Id. at 75 and Exh. 1, p. 6). The Plaintiff also asked whether Yacub's physical problems might be due to a spinal leak from her epidural, but a doctor ruled that possibility out based upon her symptoms. (Id. at Exh. 1, p. 6). The doctor did a spinal tap to check for meningitis, but doubted its presence based upon the color of her spinal fluid. (Id.). The doctor also explained that Yacub's condition was too poor to administer a dye test for venus thrombosis. (Id.) Additionally, he stated that the

---

**3.** The Court adequately addressed the Plaintiff's loss of consortium claim in its March 27, 1998, ruling, and found no need to expand upon its reasoning in an Expanded Opinion. Consequently, this Entry will not address the loss of consortium claim.

Additionally, the Court noted that its Expanded Opinion would include a ruling on the

Plaintiff's Motion for Partial Summary Judgment. (Doc. # 34). The Court overruled the Plaintiff's Motion, however, in a separate September 22, 1998, Decision and Entry. (Doc. # 40). As a result, this Entry will not address the Plaintiff's Motion.

only treatment for thrombosis was to provide Yacub with plenty of fluids, which already was being done. Cheryl Yacub died later that evening after her temperature rose to 108 degrees and her heart stopped functioning. (*Id.*).

Yacub never read any literature about Parlodel while taking the medication. (Yacub affidavit, Doc. # 21 at Exh. B, ¶ 2). Furthermore, neither Yacub nor the Plaintiff asked her doctors whether the headaches could have been caused by Parlodel, and none of the doctors at Timken Mercy ever told the Plaintiff what caused Yacub's death. (*Id.* at ¶¶ 3–7; Yacub depo. at 167, 174).

The Plaintiff subsequently consulted three attorneys later in 1991 concerning his wife's death. (*Id.* at 93). He terminated his relationship with the first attorney, after counsel requested an additional $6,000 to conduct medical research. (*Id.* at 97). The Plaintiff's relationship with the other two attorneys terminated after they informed him he did not have a meritorious case. As a result of his consultation with the attorneys, however, the Plaintiff received a report from Medview, a medical reporting service that had reviewed his wife's medical records. (*Id.* at 83, 85, 170–171). The Plaintiff reviewed the report in November, 1991. It noted that the apparent cause of Yacub's health problems, and ultimate death, was thrombosis. (Yacub affidavit at Exh. 2, p. 5) The report also identified three specific "risk factors" as possibly causing Yacub's thrombosis: her pregnancy, coagulase positive staph infection, and her use of Parlodel. (*Id.*). The report included an analysis explaining the possible connection each of these factors might have had to his wife's death. (*Id.* at p. 2–4). With respect to Parlodel, the report advised the Plaintiff that a number of other Parlodel users had experienced physical problems like his wife's. (*Id.* at p. 2).

More than two and one-half years later, the Plaintiff reviewed an August 19, 1994, newspaper article about Parlodel. The article stated that the drug's manufacturer was discontinuing its use to suppress lactation in postpartum women. It also noted that a pending lawsuit accused the U.S. Food and Drug Administration "of ignoring growing reports of deaths, heart attacks and strokes suffered by postpartum women who took Parlodel." (Doc. # 21 at Exh. B). The Plaintiff subsequently filed a Complaint (Doc. # 1) in this Court on August 7, 1996, and an Amended Complaint (Doc. # 19) on June 4, 1997. The Amended Complaint presented a survivorship claim and a loss of consortium claim. (*Id.*).

## II. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 [6th Cir.1987]). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Analysis*

■ The sole issue before the Court is whether the Plaintiff's survivorship claim is barred by the applicable statute of limi-

tations. The parties do not dispute that the claim is a product liability action subject to the two-year statute of limitations imposed by Ohio Rev.Code § 2305.10. Under Ohio law, the Plaintiff's cause of action accrued, and started the running of the statute of limitations, when he (1) knew or reasonably should have known of Cheryl Yacub's injury, and (2) knew or reasonably should have known that her exposure to Parlodel proximately caused that injury. *See Cacciacarne v. G.D. Searle & Co.*, 908 F.2d 95, 97 (6th Cir.1990); *Liddell v. SCA Services of Ohio, Inc.*, 70 Ohio St.3d 6, 13, 635 N.E.2d 1233, 1239 (1994); *O'Stricker v. Jim Walter Corp.*, 4 Ohio St.3d 84, 88, 447 N.E.2d 727, 731 (1983); *Viock v. Stowe–Woodward Co.*, 13 Ohio App.3d 7, 467 N.E.2d 1378, 1384 (1983). The parties agree that the Plaintiff knew of Cheryl Yacub's injury in February, 1991.

Thus, the critical issue is when the Plaintiff knew or reasonably should have known that Parlodel proximately caused the injury. Sandoz contends the Plaintiff, or Yacub herself, knew or should have known that exposure to Parlodel caused her severe headaches and seizures (1) shortly after she began taking the drug in February, 1991, (2) when the Plaintiff consulted three different attorneys later in 1991, or (3) at the latest, in November, 1991, when the Plaintiff obtained information about Parlodel from the medical review service. In response, the Plaintiff contends he did not associate Parlodel with Cheryl Yacub's death until reading the August 19, 1994, newspaper article about the drug.

The Plaintiff first filed a lawsuit in state court on February 17, 1995. He voluntarily dismissed that action on March 27, 1996. Thereafter, the Plaintiff filed his Complaint in this Court on August 7, 1996. (Doc. # 1). He later filed an Amended Complaint on June 4, 1997. (Doc. # 19). Consequently, if the Plaintiff knew in 1991, or reasonably should have known, that Parlodel caused Cheryl Yacub's injury, as Sandoz alleges, his survivorship claim is barred by Ohio Rev.Code § 2305.10's two-year statute of limitations. On the other hand, if the Plaintiff did not know, and reasonably should not have known, that the drug caused Yacub's injury until after reading the newspaper article in late August, 1994, then his claim is not time-barred.

In support of its Motion, Sandoz notes that Cheryl Yacub, who rarely had experienced headaches, began suffering from "unique" and severe headaches, unlike any she had experienced before, only days after she began taking Parlodel. (Yacub depo. at 23, Exh. 1; Bowen depo. at 65). Sandoz contends this fact should have alerted Yacub to a potential link between the drug and her headaches. Furthermore, Sandoz stresses that the then-current Physicians' Desk Reference warned that some users of the drug suffered from seizures or strokes after developing visual disturbances or "a constant and often progressively severe headache hours to days prior to the acute event." (Plaintiff's Response to Request for Admissions, Appendix, at Exh. E at # 6). Given her severe and unusual headaches, which began on February 11, 1991, her recognition of visual disturbances on February 12, 1991, and the availability of literature warning about her symptoms, Sandoz argues that Yacub reasonably should have known the cause of her injury at that time.

In any event, Sandoz contends the Plaintiff's subsequent 1991 consultation with three attorneys, concerning a possible lawsuit over his wife's death, certainly triggered the statute of limitations. Furthermore, Sandoz asserts that the Plaintiff's November, 1991, review of the Medview report informed him of a link between Parlodel and Cheryl Yacub's physical problems. As noted above, the report advised the Plaintiff about severe health problems that had developed after some patients take Parlodel, including seizures and strokes, frequently preceded by constant and progressively severe headaches.

Sandoz contends the Plaintiff's review of the foregoing report triggered the statute of limitations, as a matter of law, in November, 1991. Given that the Plaintiff did not file his Complaint in this Court until August, 1996, more than four and one-half years later, Sandoz argues that the survivorship claim is time-barred.

In response, the Plaintiff contends the claim is not time-barred. *First,* he notes that none of Cheryl Yacub's treating physicians associated her illness with Parlodel. *Second,* he argues that Sandoz' denial of any connection between Parlodel and Yacub's death creates a genuine issue of material fact about when the cause of action accrued. *Third,* the Plaintiff contends his consultation with attorneys did not trigger the statute of limitations, because, while he generally suspected some wrongdoing by someone, he did not link his wife's death to her Parlodel use. *Fourth,* he notes that the Medview report identified three different "risk factors" that may have caused Yacub's thrombosis: her pregnancy, a staph infection, or Parlodel. The Plaintiff then reasons: "The [August, 1994,] newspaper article gave Mr. Yacub the information sufficient to bring the current claim against this particular defendant. The information was straightforward, and it concerned new facts which were just discovered about complications from the use of Parlodel. The information prior to this article had pointed in several directions with no defendant identifiable." (Doc. # 21 at 13). The Associated Press article printed in the *Wheeling Intelligencer,* upon which the Plaintiff relies, states:

"WASHINGTON—The maker of the last lactation suppressant left on the market said Thursday it will no longer sell the drug to women who have just given birth. The move came two days after a consumer advocate filed a federal lawsuit over Parlodel, the last drug being sold in the United States to help women stop lactation after childbirth. That lawsuit accused the Food and Drug Administration of ignoring growing reports of deaths, heart attacks and strokes suffered by postpartum women who took Parlodel."

(Doc. # 21 at Exh. B).

In an affidavit accompanying his memorandum opposing summary judgment, the Plaintiff avers, in relevant part:

"10. I state that, upon reading the article was the first I became aware that the drug Parlodel was a potentially defective and hazardous drug as they were removing it from the shelves due to reports of deaths and strokes. Knowing that my wife had taken the drug, it occurred to me that it could possibly be the cause of death.

11. At no time prior to reading this article was I told or made aware that this drug was potentially hazardous, defective and/or was capable of causing death or killing women prescribed the drug for anti-lactation."

(Yacub affidavit, Doc. 21 at Exh. B, ¶¶ 10–11).

After reviewing the record and applicable law, the Court finds Sandoz' arguments in support of summary judgment unpersuasive. The Court cannot agree that the statute of limitations began running on the Plaintiff's survivorship claim, as a matter of law, when Cheryl Yacub began experiencing headaches in February, 1991. Nor can the Court agree that the limitations period began running later in 1991, when the Plaintiff consulted three attorneys based upon his generalized suspicion about the circumstances surrounding his wife's thrombosis. Finally, the Court finds unpersuasive Sandoz' argument that the two-year statute of limitations began running in November, 1991, when the Plaintiff read the Medview report.

 As noted above, the relevant inquiry is when the Plaintiff knew or should have known that Parlodel proximately caused Cheryl Yacub's injury. *Cacciacarne v. G.D. Searle & Co.,* 908 F.2d 95, 97 (6th Cir.1990). At the time she was taking Parlodel, however, Yacub did not associate

her headaches with the drug. She did not read any literature about the drug, and the Yacubs did not ask her doctors whether Parlodel was causing her physical problems. (*Id.* at ¶¶ 2–5). The record simply is devoid of evidence indicating that the Yacubs knew or should have known, in February, 1991, that Parlodel proximately caused her thrombosis-induced headaches.[4]

■ The Court is equally unpersuaded that the statute of limitations began running, as a matter of law, on the Plaintiff's product liability survivorship claim later in 1991, when he consulted three attorneys about possible legal action stemming from his wife's death. Nothing in the record suggests that the Plaintiff knew, or should have known, of a causal relationship between Cheryl Yacub's injury and her use of Parlodel when he consulted the attorneys. Rather, the record suggests that the Plaintiff generally was suspicious about the care his wife received and sought the assistance of counsel to investigate and evaluate the circumstances surrounding her death. (Yacub depo. at 93–112). Although the Plaintiff knew of Yacub's injury at that time, the record does not suggest that he knew the cause of her injury, which is a requirement for commencement of the statute of limitations. *Cacciacarne*, 908 F.2d at 97.

In support of its argument that the Plaintiff's contact with counsel triggered the statute of limitations, Sandoz cites three cases. In two of those cases, however, the plaintiffs contacted an attorney based upon an articulated suspicion that their physician had engaged in medical malpractice. As a result, the consultations demonstrated that the plaintiffs knew of their injuries, knew they were caused by a

medical diagnosis, treatment, or procedure, and constituted strong evidence that the plaintiffs were aware of the alleged malpractice. This knowledge triggered the medical malpractice statute of limitations. *See Hoffman v. Davidson,* 31 Ohio St.3d 60, 62, 508 N.E.2d 958, 961 (1987); *Burris v. Romaker,* 71 Ohio App.3d 772, 773, 775, 595 N.E.2d 425, 426–427 (1991). In the third case, *Schulze v. Foss,* Shelby Cty.App. No. 17–91–7, 1991 WL 277373 (Dec. 27, 1991) (unpublished), the plaintiff had undergone surgery in 1980 for, among other things, the removal of an ovary. For the next eight years, she experienced abdominal pain. Thereafter, two different surgeons operated in 1988 and told the plaintiff they had removed a mass containing an ovarian remnant. Although the plaintiff insisted that this knowledge did not alert her to a potential claim against the defendants, who had performed the 1980 surgery, the court found her assertion unconvincing. The court determined that the statute of limitations had started running when she was informed about the removal of the ovarian remnant. The Court also cited *Burris* for the proposition that a "cognizable event" had occurred, because the plaintiff had consulted with an attorney.

Upon review, the Court finds the foregoing case law distinguishable and, therefore, unpersuasive. The medical malpractice cases cited do not support a blanket rule that consultation with an attorney automatically triggers a statute of limitations. Furthermore, unlike the litigants in the cases cited above, who either knew or should have known the *cause* of their injuries when they consulted an attorney, the Plaintiff does not appear to have possessed similar knowledge when he contacted

---

4. In its Motion for Summary Judgment, Sandoz argues that if Cheryl Yacub had consulted the Physician's Desk Reference, she would have discovered that some women suffered from seizures, strokes, visual disturbances, and unremitting headaches hours to days after taking Parlodel. Given that she was experiencing these symptoms, Sandoz contends Yacub should have known of her product lia-

bility/survivorship action against the company. (Doc. # 20 at 10). The record contains no evidence, however, indicating that Yacub had been given a copy of the Physician's Desk Reference or even knew of its existence. In any event, the Court is unpersuaded that she had an obligation to conduct independent medical research about possible adverse consequences of Parlodel.

counsel. *Cf. Telakowicz v. John Bunn Co.,* Ashland Cty.App. No. CA–1024, 1993 WL 289898 (Ohio App. July 23, 1993) (unreported) (declining to hold that a plaintiff's unconfirmed suspicions, combined with his consultation with counsel, triggered the statute of limitations in a product liability action). Nothing in the record suggests that the Plaintiff knew or should have known that Parlodel caused his wife's injury when he sought legal advice. Rather, as the Court has noted, the Plaintiff inquired generally about the circumstances surrounding her death and sought assistance in conducting an investigation. In the Court's view, his generalized suspicion that some type of wrongdoing might have occurred, without knowledge of the cause of his wife's injury, is insufficient to trigger the statute of limitations.[5]

■ Finally, the Court finds unpersuasive Sandoz' argument that the Plaintiff's review of the Medview report triggered the statute of limitations. One of the Plaintiff's attorneys requested the report as part of his investigation into the circumstances surrounding Cheryl Yacub's death. (Yacub depo. at 83–86). The Plaintiff later obtained and read his own copy of the report in November, 1991. (*Id.* at 109–111, 170–171, and Exh. 2). The report explained that Parlodel is prescribed to inhibit physiological lactation. It advised the Plaintiff that some other Parlodel users had experienced seizures or strokes following progressively severe, unremitting headaches. It also noted that the symptoms occurred primarily postpartum and involved patients with uncomplicated prenatal and obstetric experiences. Finally, the report informed the Plaintiff that Cheryl Yacub's Parlodel use constituted a "risk factor" for the onset of thrombosis, which the report identified as causing her death. Sandoz argues that this information reasonably should have alerted the Plaintiff to a link between Parlodel and his wife's injury.

In response, the Plaintiff notes that the Medview report identified three possible causes of his wife's thrombosis. Consequently, he argues tha: ..he report did not trigger the statute of li ..itations, because it did not provide a definite opinion about the cause of her death. (Doc. # 21 at 12). In addition to naming Parlodel as a "risk factor," the report identified Cheryl Yacub's staph infection and her pregnancy itself as possible causes of her thrombosis. In particular, the report stated:

"A review of the literature indicates [that] pregnancy as well as infection are risk factors for the development of superior sagittal thrombosis ... Pregnancy alone increases the risk thirteen times, ... albeit still a small risk.... And by her positive endometrial culture as well as elevated white blood cell count, we can assume she had an infection.... Attachment 28 describes the malignant nature of a coagulase positive staph infection. If untreated it can become invasive and progressive[,] damaging tissues by local or remote action. Mrs. Yacub's endometrial culture was positive for coagulase staph....

"How does pregnancy increase the risk of SSS thrombosis? .. In pregnancy a decrease in Protein S and C has been observed ... and much literature has made reference to this deficiency. This natural anticoagulant (Protein C) normally assists in clot prevention. Mrs. Yacub may have been in a hypercoagulable state as well as had an active infection, thereby increasing even more her risk factors....

---

**5.** Sandoz argues that the statute of limitations cannot be tolled simply because the Plaintiff's attorneys advised him that no meritorious claim existed. The basis for the Court's ruling, however, is not that the Plaintiff received discouraging legal advice. Rather, the Plaintiff's consultation with an attorney did not trigger the statute of limitations because nothing in the record indicates that, when he contacted an attorney (or immediately afterward, for that matter), he knew or should have known that Parlodel caused· his wife's injury.

"Therefore, Mrs. Yacub's risk factors [f]or SSS thrombosis included pregnancy, coagulase positive staph infection and the administration to her o[f] the medication Parlodel.... Note Attachment 34 states overall mortality is 25%, or survival would be 75%."

(Yacub depo. at Exh. 2).

Sandoz counters the Plaintiff's argument by contending that a definite opinion about the cause of Cheryl Yacub's death was not needed to trigger the statute of limitations. Rather, it argues that the statute of limitations began running when the Plaintiff received information showing that his wife's injury "may be related to" or is "probably linked" to Parlodel exposure. In support, Sandoz cites only this Court's opinion in *Zarvis v. McNeil Pharmaceutical,* No. C–3–84–983 (S.D.Ohio Dec. 28, 1990). In that case, the plaintiff initiated a product liability action to recover damages resulting from her *in utero* exposure to the drug Diethylstilbestrol (DES), which her mother had taken during pregnancy. At the time of the plaintiff's lawsuit, Ohio Rev. Code § 2305.10 contained a specific provision addressing the latent effects of DES and providing:

"An action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose....

"For purposes of this section, a cause of action for bodily injury which may be caused by exposure to diethylstilbestrol ... arises upon the date on which the plaintiff learns from a licensed physician that he has an injury which may be related to such exposure, or upon the date on which by the exercise of reasonable diligence he should have become aware that he has an injury which may be related to such exposure, whichever occurs first."

*Id.* at 6.

After setting forth this standard, the Court recognized that, pursuant to the general "discovery" rule for bodily injury actions under Ohio Rev.Code § 2305.10, the statute of limitations commences when a plaintiff reasonably knows or should have known, with due diligence, that her injury was caused by the defendant. *Id.* at 7, citing *O'Stricker v. Jim Walter Corp.,* 4 Ohio St.3d 84, 447 N.E.2d 727 (1983), and *Viock v. Stowe–Woodward Co.,* 13 Ohio App.3d 7, 467 N.E.2d 1378, 1384 (1983).

The Court then found the plaintiff's claim time-barred by Ohio Rev.Code § 2305.10's statute of limitations for DES claims. In so doing, the Court noted the plaintiff's admission that "she knew at the time of her [1979] hospitalization that there was very likely some link between her mother's ingestion of DES and her injuries." *Zarvis,* at 7. Finding this knowledge sufficient to trigger the statute of limitations for a DES claim, the Court recognized that a cause of action accrued under then-existing § 2305.10, whenever a plaintiff became aware of "an injury which may be related to" DES exposure. *Id.* at 8. Applying this standard, the Court found the plaintiff's claim time-barred. *Id.* In support of its ruling, the Court cited *Harper v. Eli Lilly and Co.,* 575 F.Supp. 1359 (N.D.Ohio 1983). In that case, the court held that the plaintiffs' DES claims accrued when they learned that their medical problems "probably" were linked to DES.

■ Upon further reflection, the Court finds Sandoz' reliance upon *Zarvis* unpersuasive. Sandoz argues that the Plaintiff's cause of action accrued when he read the Medview report, because the report identified Parlodel as one of three possible causes of Cheryl Yacub's thrombosis. As in *Zarvis,* Sandoz contends this information apprised the Plaintiff that his wife's injury "may be related to" Parlodel exposure, thereby commencing the statute of limitations. Under present Ohio law, however, knowledge that an injury "may be related to" a drug is not necessarily sufficient to trigger Ohio Rev.Code § 2305.10's two-year statute of limitations.

In *Burgess v. Eli Lilly & Co.,* 66 Ohio St.3d 59, 609 N.E.2d 140 (1993), the Ohio

Supreme Court declared unconstitutional the portion of § 2305.10 relied upon by this Court in *Zarvis* and cited by Sandoz in its Motion. The *Burgess* court reasoned that the statutory language violated the right-to-remedy clause of the Ohio Constitution by providing for the accrual of a DES claim when a plaintiff discovers that she has an injury "which may be related to such exposure." *Id.* at 142. "Simply put," the court explained, "the two-year statute of limitations is triggered when the plaintiff learns that she *possibly* has a DES-related injury." *Id.* The court then noted that "[t]here is more than a semantic difference between knowing that one has a DES-caused injury and knowing that one *may* have such an injury. A degree of certainty is missing. Knowledge of the possibility that an injury may be related to a specific cause simply does not reach the constitutionally mandated threshold granting every person a remedy in due course of law for an injury done." *Id.* The *Burgess* court did recognize, however, that a "plaintiff need not be able to prove her claim to a degree of metaphysical certitude before" her cause of action accrues. *Id.* at 143. Nevertheless, she must know, or should have known, the cause of her injury before the statute of limitations commences. *Id.* at 141–143. As a result, the court struck the infirm portion of Ohio Rev.Code § 2305.10, and the state legislature has revised the statute's DES language, bringing it into conformity with the traditional standard governing the accrual of all other product liability actions (i.e., a plaintiff must know or should have known that DES proximately caused her injury).[6]

In light of *Burgess*, the Court rejects Sandoz's argument that statute of limitations necessarily began running when the Plaintiff learned that Cheryl Yacub's injury "may have been related" to Parlodel

exposure. Given that "metaphysical certitude" is not required, however, the Court must determine what level of certainty does satisfy § 2305.10's "know or reasonably should have known" requirement. The Sixth Circuit's ruling in *Cacciacarne v. G.D. Searle & Co.*, 908 F.2d 95 (6th Cir.1990), provides substantial guidance. In *Cacciacarne*, an Ohio diversity action, the plaintiff had an intrauterine device ("IUD") inserted in 1978. She subsequently had the IUD removed because she was experiencing pain. *Id.* at 96. After having difficulty conceiving a child in 1984, the plaintiff consulted a specialist, who voiced his suspicion that the IUD was responsible for her blocked fallopian tubes, which was causing the fertility problem. *Id.* The doctor also suspected, however, that the problem might be due to endometriosis or might be hormone-related. He subsequently performed surgery a.month later and discovered that the tubes no longer were blocked. No further discussion about the cause of blockage occurred. *Id.* Thereafter, in 1985, the plaintiff met with the doctor again, and he informed her that one tube still was blocked. *Id.* In April, 1986, a different doctor told the plaintiff that she was unable to become pregnant. He stated that the IUD was the most likely cause. *Id.*

Given these facts, the Sixth Circuit concluded that the statute of limitations on the plaintiff's subsequent product liability lawsuit against the IUD manufacturer did not commence until April 1996, when she learned that she would not be able to conceive. *Id.* at 97. In reaching this result, the court first noted the separate lines of cases in Ohio setting forth the statute of limitations for product liability actions and medical malpractice actions. *Id.* (citing *O'Stricker*, 4 Ohio St.3d 84, 447 N.E.2d 727, which involved a product lia-

---

**6.** Parenthetically, the Court notes that its ruling in *Zarvis* likely would survive even under the standard applied by the *Burgess* court. In *Zarvis*, the plaintiff had been told "that she had a rare form of cancer whose victims *almost always* were exposed to DES in ute-

ro...." (Emphasis added). At the same time, she learned that her mother, in fact, had taken DES during pregnancy. *Zarvis*, at 8. Armed with this information, the plaintiff reasonably could be said to have known that DES caused her injury.

bility claim and, therefore, involved Ohio Rev.Code § 2305.10; and *Allenius v. Thomas*, 42 Ohio St.3d 131, 538 N.E.2d 93 (1989), which involved medical malpractice and implicated Ohio Rev.Code § 2305.11). Although *Cacciacarne* involved a product liability claim, the Sixth Circuit concluded that the plaintiff's action was not time-barred under either standard. In reaching this result, the court reasoned:

"Applying either the *O'Stricker* test or the *Allenius* 'cognizable event' test, we hold that plaintiff's cause of action did not accrue until Dr. Schmidt informed her she would not be able to conceive. Prior to that time there was no certainty about plaintiff's condition, or the cause of her condition. The nature of the problem was unclear. The precise question is whether Dr. Seiler's statement to the plaintiff that the IUD might be the cause of her tubal blockage was enough to put her 'on notice of the need to pursue [her] possible remedies.' *Allenius*, 538 N.E.2d at 96.... It is undisputed that plaintiff thought the IUD might possibly have caused her problem. But her doctor did not know the cause. He did not rule out endometriosis or other possible causes. Because plaintiff's doctor did not know the cause, 'it would be illogical to hold [her] to a higher degree of knowledge than [her] ... physician[ ].... This case was not far enough along the scale of clarity and certainty of condition and cause to trigger the running of the statute until April[,] 1986."

*Id.* at 97–98.[7]

Similarly, in the present case, the Medview report did not inform the Plaintiff, with any degree of certainty, what had caused Cheryl Yacub's injury. Like the plaintiff in *Cacciacarne*, he knew only that her thrombosis-induced headaches and seizure were proximately caused by one of three things: her pregnancy, a staph infection, or her use of Parlodel. The Medview report did not even indicate which one of the three potential causes *most likely* caused her injury. It did note, however, that pregnancy alone multiplied the risk of thrombosis thirteen times, even though the risk remained small. The report also recognized that pregnancy, when combined with an active staph infection, may have increased Yacub's risk even more. With respect to Parlodel, the report noted 50 incidents of hypertension after using the medication, 38 incidents of seizures, and 15 incidents of strokes. Although the report did not reveal how many women nationwide had been prescribed Parlodel to combat lactation, the Court doubts that these figures represent a large percentage of Parlodel users. Consequently, it cannot be said, based upon the Medview report, that Parlodel probably caused Cheryl Yacub's health problems. Rather, the evidence suggests only that Parlodel *may* have caused Yacub's thrombosis-induced headaches.[8] As a result, the requisite degree of certainty is missing. *Burgess*, 66 Ohio St.3d 59, 609 N.E.2d 140. The record simply does not support a finding that the Plaintiff knew or should have known, after reading the Medview report, that Parlodel proximately caused his wife's injury.

---

**7.** The court noted that its conclusion was "especially true" because the plaintiff's tubes apparently became unblocked one month after Dr. Seiler informed her of the three possible causes for her infertility. *Id.* at 98. This fact, however, merely reinforced the court's holding. Furthermore, it is significant that the court *did not* find the plaintiff's cause of action to have accrued later, in 1985, when she discovered that one tube remained blocked. At that time, she knew of her physical problem, and she had been given three possible causes for the infertility. Nevertheless, the court determined that the statute of limitations commenced in 1986, when the plaintiff finally discovered the cause of her problem with relative certainty.

**8.** Even the Physician's Desk Reference volume quoted by Sandoz notes that "the relationship of these adverse reactions [i.e., seizure, stroke, hypertension, headaches, and visual disturbances] to Parlodel is not certain." (Plaintiff's Responses to Requests for Admission, Appendix at Exh. E, No. 6).

In reaching this conclusion, the Court does not dispute Sandoz' argument that the 1994 newspaper article relied upon by the Plaintiff contains much the same information as the 1991 Medview report. The Plaintiff insists that the 1994 newspaper article first revealed the possible "causal connection" between Parlodel and his wife's injury. (Yacub affidavit at ¶ 10). As noted above, the article mentioned growing reports of deaths, heart attacks, and strokes suffered by postpartum women who took Parlodel. The 1991 Medview report, however, advised the Plaintiff of much the same information, noting that a number of postpartum women taking Parlodel had suffered from hypertension, strokes, or seizures, often after suffering from unremitting headaches. Contrary to Sandoz' argument, however, the news article is not entirely duplicative of information contained in the Medview report. Unlike the report, the news article specifically apprised the Plaintiff that Parlodel's manufacturer was discontinuing the drug's use as a lactation suppressor in the wake of increased injuries reported by postpartum women. Construing the evidence in a light most favorable to the Plaintiff, this information reasonably might have bolstered his suspicion that Parlodel caused his wife's injury. In any event, the critical issue is whether the Plaintiff knew or should have known, more than two years before filing his Complaint, that Parlodel proximately caused his wife's injury. Regardless of *why* the 1994 newspaper article prompted the Plaintiff to commence litigation on August 7, 1996, the record before the Court does not demonstrate that the statute of limitations barred him from doing so.

In reaching this conclusion, the Court is mindful of Ohio's line of medical malpractice cases holding that the occurrence of a "cognizable event" triggers the statute of limitations and imposes a duty on a plaintiff to investigate the facts and pursue possible remedies. In *Allenius v. Thomas,* 42 Ohio St.3d 131, 538 N.E.2d 93

(1989), the Ohio Supreme Court defined a "cognizable event" as an event "which does or should lead the patient to believe that the condition of which the patient complains *is* related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his remedies." *Id.* at the Syllabus (Emphasis added). Once such a patient knows or should know that his injury is related to a medical procedure, treatment, or diagnosis, he has a duty to investigate the facts and determine whether his treating medical professional has committed malpractice. *Id.* at 96. Similarly, in *Flowers v. Walker,* 63 Ohio St.3d 546, 589 N.E.2d 1284 (1992), the court recognized that a plaintiff need not discover the legal significance of the facts surrounding her injury in order for the statute of limitations to start running. *Id.* at 1287. Likewise, a medical malpractice plaintiff need not discover every relevant fact, such as the tortfeasor's identity, before triggering the statute of limitations. *Id.* at 1288. However, a plaintiff must have reason to believe that her condition is related to a medical diagnosis, treatment, or procedure. *Id.* at 1287–1288. The *Flowers* court explained that this interpretation of the discovery rule placed medical malpractice plaintiffs on equal footing with other tort litigants. *Id.* at 1288. For example, the court noted that when an automobile accident is caused by a tire blowout, the plaintiff does not receive additional time to determine whether the tire was defective or learn the manufacturer's identity. *Id.* In such a case, the statute of limitations begins running after the accident, and the plaintiff has an obligation to determine, through discovery, whether the tire was defective and who manufactured it.

To the extent these cases might be applied to the present litigation by analogy, the Court's result would not change. Applied to the present facts, the foregoing case law suggests that the Plaintiff's two-

year statute of limitations did not begin running until he knew or should have known that Parlodel caused his wife's injury. Once the plaintiff determined the cause of his wife's injury with relative certainty, however, the statute of limitations began running, even though he did not know whether the Parlodel was defective, who manufactured the drug, or the legal significance of the facts (i.e., that he possessed a possible product liability claim). At that point, just like a plaintiff who knows a blown tire caused his traffic accident, the Plaintiff had an obligation to investigate the facts and pursue his potential remedies. *Cf. Lundy v. Lederle Laboratories*, 54 Ohio App.3d 192, 195, 561 N.E.2d 1027, 1032 (1988) (noting that "when a person discovers the causal relationship between a physical injury and use of a product, necessarily, he may infer a defective or negligently manufactured product ...."). This conclusion is further supported by the Sixth Circuit's ruling in *Cacciacarne*, 908 F.2d at 95. As noted above, the court determined that the statute of limitations began running on the plaintiff's product liability action when she learned the cause of her injury. *Id.* at 97–98. The court found the plaintiff's prior knowledge that a defective product was one of three *potential* causes for her injury insufficient to trigger the statute of limitations, even under the *Allenius* "cognizable event" test. *Id.* at 97. Similarly, in *Colby v. Terminix International Co.*, Stark App. No. 96–CA–0241 (Ohio App. Feb. 10, 1997) (unreported), the Ohio Fifth District Court of Appeals recently held that the product liability statute of limitations begins to run when a plaintiff knows the cause of his injury, not when he suspects the cause. The *Colby* court also reasoned that arousing a person's suspicion of the need to investigate causation does not trigger the statute of limitations.

In short, the Court concludes, as did the *Cacciacarne* court, that the present case "was not far enough along the scale of clarity and certainty of condition and cause

to trigger the running of the statute" in 1991. Rather, the two-year statute of limitations found in Ohio Rev.Code § 2305.10 began running in late August, 1994, when the Plaintiff reviewed the August 19, 1994, newspaper article about Parlodel. He filed his first Complaint (Doc. # 1) in this Court on August 7, 1996. As a result, his survivorship claim is not time-barred. Based upon the foregoing reasoning, Defendant Sandoz' Motion for Summary Judgment (Doc. # 20) is OVERRULED.

### IV. *Conclusion*

The Court's March 27, 1998, Decision and Entry (Doc. # 39) is vacated to the extent it sustained the Defendant's Motion for Summary Judgment (Doc. # 20) on the Plaintiff's survivorship claim. Defendant Sandoz' Motion for Summary Judgment (Doc. # 20) is hereby OVERRULED in its entirety. Trial on all claims is set for October 4, 1999.