**Ray LOWER, Plaintiff,**

v.

**ELECTRONIC DATA SYSTEMS CORPORATION, Defendant.**

No. 3:02CV180.

United States District Court,
S.D. Ohio,
Western Division.

July 6, 2007.

James P. Langendorf, Middletown, OH, for Plaintiff.

David A. Posner, Duvin Cahn & Hutton, Cleveland, OH, for Defendant.

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 14); JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, District Judge.

Defendant Electronic Data Systems ("Defendant" or "EDS") is a corporation that provides a variety of information tech-

nology services to corporate and government customers. Plaintiff was formerly employed in Defendant's Customer Assistance Center in Dayton, Ohio. The termination of Plaintiff's employment on July 17, 2001, is the subject of this litigation. Plaintiff believes that he was entitled to a bonus from Defendant pursuant to an incentive program offered by it that awarded bonuses to certain authorized employees who obtain certain types of certification offered by Microsoft. He obtained one such type of certification and alleges that he was improperly denied the bonus and, moreover, that he was terminated because of his insistence that he receive that bonus. He filed a complaint in the Common Pleas Court of Montgomery County, Ohio, alleging Wrongful Discharge in Violation of the Public Policy of the State of Ohio (Count One), Promissory Estoppel (Count Two) and Fraud (Count Three). Pursuant to 28 U.S.C. § 1446, Defendant filed a Notice of Removal (Doc. # 1) in this Court. Plaintiff is a resident of Ohio, and Defendant is a Delaware corporation with its principal place of business in Texas. Additionally, the amount in controversy exceeds $75,000.00. As such, jurisdiction in this Court is proper, pursuant to this Court's diversity jurisdiction, 28 U.S.C. §§ 1441 and 1332.

On December 6, 2002, this Court entered a stipulated dismissal of Plaintiff's fraud claim (Count Three) with prejudice (Doc. # 13). The matter is currently before the Court on Defendant's Motion for Summary Judgment (Doc. # 14) as to Plaintiff's remaining claims, to wit: wrongful discharge in violation of public policy and promissory estoppel. For the reasons assigned herein, Defendant's motion is sustained.

## I. Standards Governing Motions for Summary Judgment

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to with-

stand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## II. Factual Background

At all pertinent times, Defendant provided a Vendor Certification Incentive Program ("Program"), which awarded bonuses to certain authorized employees who received Microsoft certifications. One of the types of certifications recognized under the Program was the Microsoft Certified Systems Engineer ("MCSE") certification. Defendant indicates that an employee who was interested in participating in the Pro-

gram must first have discussed his career plans with a supervisor to determine whether the relevant certification would apply to his then current position with EDS (Doc. # 14 at 3). Next, an employee was to complete an application thirty days prior to taking the certification courses. Defendant indicates that before an employee commenced certification courses, he must first have obtained approval from his supervisor, via the application process (*Id.*). After completing course work and passing the requisite exams, an authorized employee must have provided documentation of his exam scores to his leader and sign a Certification Verification and Program Acknowledgment Form, which required the employee to explain how he used the certification skills in his position. The form also disclaimed any guarantee of any future employment at EDS. Finally, the form set out the procedures for obtaining the bonus, which was to be paid in three annual installments of $5,000. In order to receive each installment, the employee must have remained employed at EDS and have held the same position for which the certification was approved (*Id.* at 4).

In January, 1998, Plaintiff interviewed for a position at EDS. During that interview, Plaintiff expressed his desire to obtain the MCSE certificate, and Linda Imwalle, with whom he interviewed, mentioned the Program "in passing" (Doc. # 17 at 2; Lower Depo. Doc. # 14, Ex. 1 at 38). The conversation did not cover any conditions or restrictions to receiving the bonus. Plaintiff admits that the discussion left him with a number of unanswered questions regarding the Program (Doc. # 14, Ex. 1, Lower Depo. at 40–42).

In February, 1998, Plaintiff commenced his employment with EDS as a help desk operator (Doc. # 17 at 2). Approximately 18 months later, in August or September, 1999, Plaintiff again inquired of Imwalle (who was the direct superior of Plaintiff's supervisor) regarding the Program. Plaintiff describes a series of conversations, occurring in Imwalle's office, in which she confirmed that the Program was still in existence and that the size of the bonus was $15,000. These conversations with Imwalle, like the one during Plaintiff's interview, did not cover any requirements for obtaining the bonus or the necessary steps to enroll in the Program (Lower Depo. at 38, 95–97).

Nevertheless, Plaintiff commenced the course work required to obtain the MCSE certification in or about November, 1999. He took these classes on his own time and paid for them with his own money, submitting reimbursement requests to Barbara Karrick, who had replaced Imwalle as the direct superior of Plaintiff's supervisor (Doc. # 17, Ex. 1, Karrick Depo. at 30–31). In January, 2001, he received his MCSE certification. However, it is undisputed that Plaintiff never spoke with his leader to discuss the applicability of MCSE certification to his position, never applied for the bonus, never received approval for the bonus, and never signed the Certification Verification and Program Acknowledgment Form.

Regardless, in the subsequent six months, Plaintiff reports that he "badgered his managers to pay him the bonus he had earned" (*Id.*). On June 11, 2001, Plaintiff met with Karrick and Doug Morrison, Account Manager (and Karrick's supervisor), to discuss the issue of the bonus. Karrick indicates that, following that meeting, Morrison planned to confer with his manager in Detroit and then submit a request.

Meanwhile, in the Summer of 2001, EDS issued a corporate directive to remove the lowest performing EDS employees (Doc.

# 14, Ex. 2, Karrick Depo. at 59–61). Said lowest performing employees were identified using assessments made by the company. According to EDS, Plaintiff was placed in the lowest of five performance groupings, based on an assessment completed in August, 2000. Placement into this fifth group connoted performance that was in the bottom 10% of all employees in Plaintiff's segment of the company (Karrick Depo. at 49; Doc. # 14, Ex. 5). Accordingly, on July 17, 2001, Plaintiff was informed of his termination by Linda Storer (his direct supervisor) and Morrison.

## III. Analysis

### A. *Wrongful Discharge*

■ Plaintiff alleges that his discharge was based on his insistence that he receive a bonus under the Program, in violation of the public policy of the state of Ohio. Under Ohio law, in order to prevail on a claim for wrongful discharge in violation of public policy, a Plaintiff must establish the following elements: (1) that clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the "clarity element"); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the "jeopardy element"); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the "causation element"); and (4) the employer lacked overriding legitimate business justification for the dismissal. *Wiles v. Medina Auto Parts,* 96 Ohio St.3d 240, 242, 773 N.E.2d 526, 530 (Ohio 2002), *citing* H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?,* 58 U. Cin. L.Rev. 397, 398–99 (1989).

Herein, Plaintiff insists that a clear public policy exists in Ohio Revised Code § 4113.15, which requires employers to pay employees their earned wages on no less than a bi-weekly basis (Doc. # 17 at 14). Although § 4113.15 does not include bonuses in its definition of wages, Plaintiff cites the Ohio Administrative Code's provision regarding compensation for lost wages under claims for workers' compensation. That code provision indicates that bonuses are to be included in the calculation of wages as present earnings. OH ADC 4124–1–01(A)(16). From there, Plaintiff reasons that the bonus to which he alleges he was entitled is included in § 4113.15's definition of wages.

■ Plaintiff's rationale suffers from a number of shortcomings. *First,* as Defendant notes, Plaintiff's reliance on the administrative regulations governing workers' compensation claims is peculiar, given that he does not allege the public policy at stake herein to arise from workers' compensation (Doc. # 18 at 4). *Second,* even assuming *arguendo* that Plaintiff is correct that the Administrative Code is instructive as to § 4113.15's definition of wages, § 4113.15 expressly applies only to wages that are not in dispute. Ohio Rev.Code § 4113.15(B). Even if the bonus to which Plaintiff believes he is entitled is properly considered part of his wages, the fact of his entitlement thereto is very much in dispute, and therefore outside the scope of § 4113.15.[1] Since there is no clear public policy favoring the payment of a disputed bonus, Plaintiff presents no genuine issue of material fact as to the first element of his wrongful discharge claim.

■ As Defendant notes, the absence of a clear public policy of the type urged by Plaintiff renders extremely unlikely the

---

1. Further, as noted *infra,* Plaintiff simply was not entitled to the bonus, by virtue of his failure to comply with nearly all of the requirements set forth by EDS to obtain same.

prospect of proving that public policy was jeopardized by an action of EDS (Doc. # 14 at 8). Nonetheless, the Court does note that, even were there a recognized public policy of the sort urged by Plaintiff, it is unclear that it is in jeopardy here. In *Wiles*, the Ohio Supreme Court considered whether a plaintiff may pursue a claim in Ohio for wrongful discharge in violation of the public policy enshrined in the federal Family and Medical Leave Act ("FMLA"). The Court agreed that the FMLA evinced a clear public policy to prohibit employers from interfering, denying or restraining rights granted therein. 96 Ohio St.3d at 243, 773 N.E.2d at 531. Nevertheless, it held that, because plaintiffs are entitled to such a comprehensive array of legal and equitable remedies in order to vindicate their rights under the statute, if needed, an employer's dismissal of an employee under alleged circumstances that frustrate the objectives of the FMLA could not place that public policy in jeopardy. *Id.* Here, as Defendant notes (Doc. # 18 at 4), Plaintiff's discharge did not prejudice his ability to vindicate his alleged rights under § 4113.15, as evidenced by the existence of his promissory estoppel claim. Because there is still an avenue open to Plaintiff to enforce his rights, it cannot be said that the supposed public policy he cites has been jeopardized by his discharge.

Since Plaintiff presents no genuine issue of material fact as to either of the first two elements of his claim for wrongful discharge in violation of public policy, the Court does not believe that analysis of the remaining two elements is necessary. As such, summary judgment is proper with respect to Count One.

### B. *Promissory Estoppel*

 Plaintiff argues that he was promised the bonus by EDS, that he undertook the substantial cost in both time and money to obtain his certification in reliance upon that promise and that, as such, it should be estopped from denying him that bonus. In pursuing his claim, Plaintiff attempts to strike a balance between knowledge of the Program sufficient to argue that he was entitled to a bonus, and ignorance of the Program (for which he conveniently blames Defendant) sufficient to avoid the fact that he simply failed to undertake the proper steps to obtain the bonus. However, Plaintiff can demonstrate, at most, that he was informed of the existence of the Program, but this falls woefully short of a promise that he was entitled to a bonus thereunder. Accordingly, summary judgment is proper. Promissory estoppel is the rule of law that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 104, 483 N.E.2d 150, 154 (Ohio 1985), *quoting Talley v. Teamsters Local No.*, 377, 48 Ohio St.2d 142, 146, 357 N.E.2d 44 (Ohio 1976), *citing* Restatement (Second) of Contracts § 90 (1973). Ohio courts analyzing claims of promissory estoppel generally discern the following four elements from that rule of law: (1) the existence of a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) reasonable and foreseeable reliance; and (4) the party claiming estoppel was injured by his reliance. *Cohen & Co., CPAs v. Messina, CPA*, 24 Ohio App.3d 22, 26, 492 N.E.2d 867, 872 (Ohio App. 8 Dist.1985).

In its Memorandum in Support of Summary Judgment, Defendant understands Plaintiff's argument to be that, in this case, the doctrine of promissory estoppel operates to alter the presumption of at-will employment, and also that EDS is bound

by promissory estoppel to pay the total amount of the bonus (Doc. # 14 at 11). To this, Plaintiff responds that he does not, in fact, challenge the at-will nature of his employment with EDS and proceeds, instead, to argue only the latter of the above propositions, to wit: EDS is bound by promissory estoppel to pay the total amount of the bonus (Doc. # 17 at 10–13).

In general, Plaintiff's argument appears to be that the mere existence of the policy constituted a promise upon which he relied in obtaining his MCSE certificate, and for which he must receive a bonus.[2] Specifically, he describes events such as Imwalle's description of the Program during the interview in February, 1998, and his subsequent follow-up discussions wherein he verified the continued existence of the Program, as promises that he would receive the bonus, upon which he justifiably relied in obtaining the MCSE certificate (Doc. # 17 at 12). Moreover, he believes that "EDS had offered to pay the bonus to any employee ... who acquired an MCSE" (Doc. # 17 at 3). As fully explained herein, EDS never offered or promised to pay a bonus to any employee who obtained his MCSE. Instead, the Program established a comprehensive set of conditions and procedural requirements to be met by an employee. Only after doing so could an employee enroll in the Program and receive the bonus. Plaintiff's argument consists of an attempt to show why he should receive the bonus in spite his failure to follow the guidelines outlined by EDS for obtaining it.

In recent decisions addressing promissory estoppel, Ohio courts have interpreted very strictly the requirement that the promise be clear and unambiguous in its terms. Specifically, in *Imbrogno v. Mimrx.com, Inc.*, 2003 WL 22707792, (Ohio App. 10 Dist.2003), the court addressed a promissory estoppel claim where, in an offer of employment, the defendant had indicated to the plaintiff that "Stock Options commensurate with your position will be offered. The number of options granted to you will be subject to approval by the Company's Compensation Committee or its designee." *Id.* at *1. The defendant also had indicated in a discussion with the plaintiff that if she accepted employment with the company, "she would be granted stock options 'significant enough' to be financially secure in the 'near future.'" *Id.* In affirming the trial court's entry of summary judgment for the defendant, the court concluded that all of the material terms were missing, noting that "[n]either the offer letter nor the discussion between [the plaintiff] and [the company's vice president] ever indicated the number of options, when they would be issued, the exercise period, the vesting schedule, or the strike price." *Id.* at *6.

Herein, the purported promise received by Plaintiff from EDS is equally devoid of details. As noted *supra,* at the time Plaintiff commenced course work for the MCSE certification, he had not discussed with anyone at EDS the details of the Program,

---

2. Plaintiff also devotes considerable discussion to the difference between unilateral and bilateral contracts, implying that the circumstances herein demonstrate the formation of a unilateral contract, in which the existence of the Program constituted an offer and Plaintiff's performance (i.e., his obtaining the MCSE certificate) constituted his acceptance (Doc. # 17 at 11). This contradicts his own allegations, in that a claim for promissory estoppel concedes that no contract exists. Specifically, the doctrine of promissory estoppel serves to enforce a promise, where the requisite elements of a contract are absent, if failure to do so would be unjust. Because Plaintiff has not actually brought a claim for breach of contract, the Court does not consider his claims regarding the purported existence of a unilateral contract.

other than to confirm that it was still the policy of EDS to offer a $15,000 bonus to employees who obtained their MCSE certification. The conversations that he did have were brief (*see supra*, describing conversations with Imwalle in August or September of 1999), and did not address the issues that had remained unresolved following Plaintiff's prior discussion with Imwalle.

■ Nonetheless, Plaintiff argues that the eligibility criteria found in the Program's guidebook constituted a promise on which he reasonably and foreseeably relied. He cites the following language from that guidebook in his Memorandum in Opposition to Summary Judgment:

*To be eligible for the incentive program described herein, a person must:*
1. be a T1 employee as of the date his/her incentive plan goes into effect, and
2. have successfully attained his/her MCSE certification on or after February 1, 1997 or be in the process of attaining his/her MCSE certification.

Doc. # 17, Ex. 3 (emphasis in original). Plaintiff insists that it was reasonable for him to believe that as long he met the above eligibility requirements, he would automatically be entitled to the bonus. Furthermore, Plaintiff blames his ignorance of the Program's specific requirements on his superiors' failure to inform him of such (Doc. # 17 at 6–7). He again refers to language from the Program's Guide, which indicates that an employee's leader is responsible for communicating the details of the MCSE incentive program, for obtaining acknowledgment of the eligibility requirements from any interested candidate and for providing the program administrator with a program enrollment form and the original acknowledgment form signed by the candidate (Doc. # 17 at 7, *citing* Doc. # 17, Ex. 3).

Plaintiff reasons that since it was the leader's responsibility to communicate the details of the Program to interested employees, and since his leader did not do so, he cannot be charged with knowledge of any of the specific requirements or conditions of the Program, and, therefore, that his reliance on the guidebook's eligibility criteria alone was reasonable.

However, merely meeting the above eligibility criteria did not entitle an employee to the bonus. In fact, an employee must have discussed his career plans with a supervisor to ensure that the certification would apply to his then current position and he also must have completed the requisite paperwork for the Program. Since Plaintiff did none of these, Defendant insists that his reliance was not reasonable or foreseeable. Defendant concedes that Plaintiff was *eligible* for the Program, but insists that the operative issue is whether he was *authorized* for the Program, and not merely whether he was eligible for it.

A recent decision from an Ohio appellate court rejects the proposition that general eligibility language is sufficient to constitute a clear and unambiguous promise on which an employee can reasonably and foreseeably rely. In *Rigby v. Fallsway Equipment Co., Inc.*, 150 Ohio App.3d 155, 779 N.E.2d 1056 (2002), the plaintiff argued that an employee manual's statement of eligibility requirements for medical leave amounted to a promise of continued employment. Affirming the trial court's entry of summary judgment on that issue, the court rejected the plaintiff's argument and specifically indicated that a person could not reasonably and foreseeably rely on the employee handbook to alter the at-will relationship, because disclaimer language in the handbook had specifically indicated otherwise. 150 Ohio App.3d at 162–63, 779 N.E.2d at 1062. Similarly, here, the very same manual from which

Plaintiff read the eligibility language contained specific information on the procedures that an employee must have followed in order to be authorized to enroll in the Program and ultimately to obtain the bonus. There simply is no genuine issue of material fact as to whether the Program guidebook could promise the bonus without first obtaining authorization to enter the Program. Plaintiff relies on parts of the guidebook that, he believes, support his claim that a promise was made, yet he altogether disclaims knowledge of the parts of the guidebook that are detrimental to his claim. This is not reasonable. Accordingly, the Court agrees with Defendant that Plaintiff's selective reliance on the Program guidebook is nothing more than "an attempt to disguise his inability to prove he was entitled to the MCSE bonus" (Doc. # 18 at 3).

Furthermore, Plaintiff's argument that his superiors' supposed failure to inform him of the Program's details somehow made his reliance reasonable is not well taken. In fact, the record does not permit the inference that Plaintiff did not know of specific requirements for obtaining the bonus. Instead, as Defendant points out, Plaintiff actually conceded that, throughout his employment with EDS, he would have expected there to be books and documents about the Program (Lower Depo. at 134). In this regard, Plaintiff's very own admissions do not support the proposition that he believed that he need only to obtain the MCSE certification on his own in order to receive the bonus (without filling out paperwork or discussing it with his supervisors). Additionally, Plaintiff has also conceded that he knew that information concerning employment benefits was available on EDS's Intranet (Lower Depo. at 25). Plaintiff would have the Court believe that, suspecting that answers to his unresolved questions could be found in a place where he knew to look, it was still reasonable for him to proceed in willful ignorance. The Court does not believe that any reasonable person would make such a decision.

Lastly, the fact that Karrick processed reimbursement requests for the testing fees does not change this analysis. In fact, the record indicates no more than that Karrick merely passed those requests on to her manager, Doug Morison (Karrick Depo. at 30–31). This, without more, does not generate an inference that Plaintiff reasonably believed that he was authorized for the Program.

Because Plaintiff can demonstrate no genuine issue of material fact as to whether EDS made a promise to him in clear and unambiguous terms on which he reasonably and foreseeably relied, the Court need not address the remaining elements of his promissory estoppel claim (Count Two). As such, Defendant's Motion for Summary Judgment (Doc. # 14) is sustained. Judgment will be ordered entered in favor of Defendant and against Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.